617 So.2d 248 (1993)
SPERRY-NEW HOLLAND, A DIVISION OF SPERRY CORPORATION
v.
John Paul PRESTAGE and Pam Prestage.
No. 90-CA-0657.
Supreme Court of Mississippi.
March 25, 1993.
*250 Michael W. Ulmer, Watkins & Eager, Jackson, for defendant-appellant.
William B. Raiford, III, John H. Cocke, Charles M. Merkel, Jr., Merkel & Cocke, Clarksdale, Wayne E. Ferrell, Jr., Dale Hubbard, Ferrell & Hubbard, Jackson, for plaintiffs-appellees.
Before DAN M. LEE and PRATHER, P.JJ., and PITTMAN, J.
PRATHER, Presiding Justice, for the Court:

I. INTRODUCTION
In this case, plaintiffs-appellees, John Paul Prestage and his wife, Pam Prestage [hereinafter Prestage], sought damages arising out of the loss of John Prestage's foot and lower leg when it was caught in a combine manufactured by the defendant-appellant, Sperry-New Holland [hereinafter Sperry].
In this products liability and negligence suit, Prestage proceeded on two theories of liability, (1) strict liability in tort and (2) negligent design. Pam Prestage also sued for loss of consortium. The jury found for Prestage under both theories of recovery and awarded John $1,425,000 and Pam $218,750. The jury also found John 35 percent comparatively negligent. From this award and finding Sperry asserts the following errors:
(1) The court erred in applying a "risk-utility" analysis instead of a "consumer expectations" analysis.
(2) The court erred in refusing Sperry's "Failure to Warn" instruction, D-20.
(3) The court erred in not granting a mistrial after Prestage attempted to admit certain John Deere safety committee minutes even though the court held them inadmissible.
(4) The court erred in refusing to let Sperry impeach Edgar "Red" Prestage, Sr. with a prior inconsistent statement.
(5) The court erred in precluding evidence that Prestage had settled with his father, Edgar "Red" Prestage, Sr.
(6) The court erred in precluding opinion evidence of experts Nooyen and Poindexter that Prestage was down in the grain tank prior to the accident.
(7) The court erred in not granting Sperry's motion for directed verdict because the combine was not in substantially the same condition on the date of the accident as it was when it left Sperry's possession.
(8) The court erred in excluding evidence as to the overall condition of the combine.
(9) The court erred in giving plaintiffs' special interrogatories.
(10) The jury verdict was excessive and this Court should enter a remittitur or remand for a new trial on damages.

II. FACTS
On June 28, 1985, John Paul "Butch" Prestage lost his lower leg in a combine manufactured by Sperry-New Holland. At the time of the accident, Prestage worked for his father, Edgar "Red" Prestage, Sr. [hereinafter Red]. Red farmed land owned by his sister and employed Prestage to, among other things, operate a used Model 985 combine manufactured by Sperry-New Holland in 1969. Red purchased the combine from Greenwood Ford Tractor Sales, Inc. in 1978.
Prestage testified that he operated the combine more than anyone else in his family *251 and used the combine on the day of the accident to harvest wheat. Under normal operation of the combine, after wheat is collected, a threshing mechanism is engaged to separate the wheat heads from the straw. After the threshing of the wheat takes place, the wheat heads are dumped into a grain tank which empties into a truck. At the bottom of the grain tank, a discharge auger churns to facilitate the wheat's movement. This discharge auger looks similar to a horizontal screw which, when turning, moves the wheat from one end of the tank to the other. There is a V-shaped guard covering this spinning auger which can be adjusted to compensate for different types of grains. Wheat is not a very fluid grain, especially when damp, and requires as much space as possible to flow properly. As designed, the maximum distance the auger guard could separate from the tank bottom is 4 inches and the minimum space is 2 inches.
In addition to the discharge auger in the tank bottom, a leveling auger spins at the top and dispenses the grain throughout the tank. This auger has a guard over the top of it and needs to be operated only while the combine is harvesting wheat. It does not need to be operated when the wheat is simply being threshed.
Prestage testified that on the day of the accident he had finished harvesting wheat and had begun threshing it. He left the leveling auger on, however, as was the custom on the farm, to check for loose belts, ball bearings, etc. which might need to be replaced. As Prestage walked to the back of the combine, he noticed that the grain tank had clogged. To unclog the tank, Prestage climbed a ladder on the back of the combine to a flat section of the machine which overlooked the grain tank. The wheat heads and straw had clogged in the discharge auger, and Prestage, as was the custom on the farm, looked for a long stick he kept to free the debris. Usually, Prestage would be in the cab when the discharge auger jammed and he would only need to step out of the cab, grab the stick in front of him and jab the debris until it came free. Because Prestage had been checking the rear of the machine for repairs and climbed up the back of the combine, however, he had to lean across the tank and rest on the leveling auger guard to reach his stick. Prestage testified that he was wearing an untucked pullover jersey which became tangled on a bolt on the leveling auger. The auger wound his shirt up and pulled him into the tank. He hypothesized that the shirt tightened around his neck because he passed out upon entering the tank and awoke to find his foot and leg under the guard and mangled by the discharge auger. After a few minutes, Prestage freed himself and got to the combine cab. From there, he drove to his truck, changed vehicles, drove to his parents' home nearby and was immediately taken to the hospital by his mother. Prestage's left leg needed amputation below the knee.
Prestage sued his father and his father's liability insurer, Greenwood Ford Tractor Sales, Inc. and Sperry. Greenwood never answered the complaint and a default judgment was entered against it. Before the jury was impaneled for the trial involving the two other defendants, Prestage settled with his father and his father's liability insurer. The case proceeded to trial against Sperry, and the jury found for Prestage.

III. ISSUES
Sperry raises several issues involving the denial of a directed verdict, refusal and acceptance of certain jury instructions, the use of prior inconsistent statements, the denial of certain expert testimony and the use by Prestage of an improper theory of recovery.

Issue A: The court erred in applying a "risk-utility" analysis instead of a "consumer expectations" analysis.

1.
The trial court denied Sperry's motion for summary judgment; denied its motion for directed verdict; denied its request for peremptory instruction; and denied its motion for judgment notwithstanding the verdict [J.N.O.V.]. Sperry argues that the *252 court operated under an erroneous understanding of Mississippi products liability law in denying its requests.

2.
Miss.R.Civ.P. 56 provides that summary judgment may be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. McDonald v. Holmes, 595 So.2d 434, 437 (Miss. 1992). In Brown v. Credit Center, Inc., 444 So.2d 358 (Miss. 1983), which first interpreted Rule 56, this Court stated:
The trial court must review carefully all of the evidentiary matters before it  admissions in pleadings, answers to interrogatories, depositions, affidavits, etc. The evidence must be viewed in the light most favorable to the party against whom the motion has been made. If in this view the moving party is entitled to judgment as a matter of law, summary judgment should forthwith be entered in his favor. Otherwise the motion should be denied.
Id. at 362. See also Pace v. Financial Security Life of Miss., 608 So.2d 1135, 1138 (Miss. 1992); Lovett v. Anderson, 573 So.2d 758, 760 (Miss. 1990); Pearl River Cty. Bd. v. South East Collections, 459 So.2d 783, 784-785 (Miss. 1984); Pittman v. Home Indem. Co., 411 So.2d 87, 89 (Miss. 1982) (citing Paymaster Oil Miss Co. v. Mitchell, 319 So.2d 652 (Miss. 1975)).
This Court's standards of review regarding a denial of a judgment notwithstanding the verdict and a peremptory instruction are the same. Munford, Inc. v. Fleming, 597 So.2d 1282, 1283 (Miss. 1992); Motorola Com. & Electronics v. Wilkerson, 555 So.2d 713, 723 (Miss. 1989); Mississippi Farm Bureau Mut. Ins. Co. v. Todd, 492 So.2d 919, 927 (Miss. 1986) (citing Paymaster Oil Mill Co. v. Mitchell, 319 So.2d 652, 656 (Miss. 1975)). Our standards of review for a denial of a judgment notwithstanding the verdict and a directed verdict are also identical. Munford, 597 So.2d at 1284 (citing Litton Systems, Inc. v. Enochs, 449 So.2d 1213 (Miss. 1984)). Under this standard, this Court will:
consider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [we are] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.
Munford, 597 So.2d at 1284 (citing Litton Systems, Inc., 449 So.2d at 1214.)
The above standards of review, however, are predicated on the fact that the trial judge applied the correct law. Under the standard of review applicable to discretionary matters, this Court first asks if the court below applied the correct legal standard. See Detroit Marine Engineering v. McRee, 510 So.2d 462, 467 (Miss. 1987). If the trial court "has exercised its discretionary authority against a substantial misperception of the correct legal standards, our customary deference to the trial court is pretermitted, [citations omitted] for the error has become one of law." Nationwide Mut. Ins. Co. v. Evans, 553 So.2d 1117, 1119 (Miss. 1989) (citing Burkett v. Burkett, 537 So.2d 443, 446 (Miss. 1989)); Southern v. Glenn, 568 So.2d 281, 284 (Miss. 1990); Gibson v. Manuel, 534 So.2d 199, 204 (Miss. 1988).

3.
This case requires a re-examination of Mississippi products liability law. Two competing theories of strict liability in tort can be extrapolated from our case law. While our older decisions applied a "consumer expectations" analysis in products cases, recent decisions have turned on an analysis under "risk-utility." In this case, Sperry claims that the trial court erred in applying a "risk-utility" theory of recovery, and not a "consumer expectations" theory, when ruling on motions and jury instructions. *253 Prestage argues that while "consumer expectations" was the law at one time, recent cases have embraced "risk-utility."
We today apply a "risk-utility" analysis as adopted in Whittley v. City of Meridian, 530 So.2d 1341 (Miss. 1988) and Hall v. Mississippi Chemical Exp., Inc., 528 So.2d 796 (Miss. 1987) and write to clarify our reasons for the adoption for that test.

Strict liability in tort  why have it and what does it do?
The doctrine of strict liability for a manufacturer, without negligence, was first applied in Mississippi in State Stove Manufacturing Co. v. Hodges, 189 So.2d 113, 119 (Miss. 1966). State Stove has been consistently followed in Mississippi for many years.[1]
In State Stove, this Court accepted strict liability and defined its purpose as follows:
The purpose of [strict] liability is to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves.
Id. at 120 (quoting Greenman v. Yuba Power Products, Inc., 59 Cal.2d 57, 27 Cal. Rptr. 697, 700-701, 377 P.2d 897, 900-901 (1963)). State Stove adopted the version of strict liability stated in Section 402A of the American Law Institute's Restatement of Torts (Second). It states:
§ 402 A. Special Liability of Seller of Product for Physical Harm to User or Consumer
(1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
(a) the seller is engaged in the business of selling such a product, and
(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
(2) The rule stated in Subsection (1) applies although
(a) the seller has exercised all possible care in the preparation and sale of his product, and
(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.
Restatement (Second) of Torts § 402A. (Emphasis added).
State Stove explicitly holds that the extent of strict liability of a manufacturer for harm caused by its product is not that of an insurer. State Stove, 189 So.2d at 120. However, strict liability does relieve the plaintiff of the onerous burden of proving negligence (i.e. fault). Fault is supplied as a matter of law. Toliver, 482 So.2d at 215.
*254 Section 402A is still the law in Mississippi. How this Court defines the phrases "defective condition" and "unreasonably dangerous" used in 402A dictates whether a "consumer expectations" analysis or a "risk-utility" analysis will prevail. Problems have arisen because our past decisions have been unclear and have been misinterpreted in some instances.

"Consumer Expectations" Analysis
The term "consumer expectations" comes from comment i to Section 402A. It states:
[T]he rule stated in this section applies only where the defective condition of the product makes it unreasonably dangerous to the user or consumer ... The article sold must be dangerous to an extent beyond that which would be contemplated by the ordinary consumer who purchases it, with the ordinary knowledge common to the community as to its characteristics.
In a "consumer expectations" analysis, "[o]rdinarily the phrase `defective condition' means that the article has something wrong with it, that it did not function as expected." Ford Motor Co. v. Matthews, 291 So.2d at 172 (citing State Stove, 189 So.2d at 121). Comment g of Section 402A defines "defective condition" as "a condition not contemplated by the ultimate consumer, which will be unreasonably dangerous to him." Thus, in a "consumer expectations" analysis, for a plaintiff to recover, the defect in a product which causes his injuries must not be one which the plaintiff, as an ordinary consumer, would know to be unreasonably dangerous to him. In other words, if the plaintiff, applying the knowledge of an ordinary consumer, sees a danger and can appreciate that danger, then he cannot recover for any injury resulting from that appreciated danger.
The U.S. Court of Appeals for the Fifth Circuit has held that Mississippi employs a "consumer expectations" standard in strict products liability cases. See Batts v. Tow-Motor Forklift Co., 978 F.2d 1386, 1392 (5th Cir.1992) ("[T]he Mississippi Supreme Court [has] adhered to a `consumer expectation' test."); Toney v. Kawasaki Heavy Industries, Ltd., 975 F.2d 162, 165 (5th Cir.1992) ("Mississippi has adopted the objective `consumer expectations' test to determine whether a product is unreasonably dangerous and therefore defective."); Melton v. Deere & Co., 887 F.2d 1241, 1243 (5th Cir.1989) ("Consumer expectation [is] still the basis of Mississippi's test"); Gray v. Manitowoc Co., Inc., 771 F.2d 866, 869 (5th Cir.1985) ("[t]he State Stove and Ford [v. Matthews] courts' commitment to the consumer expectation test for product defects had not been undermined by any subsequent decision of the Mississippi Supreme Court"). Sperry contends that this Fifth Circuit precedent controls this case. It argues that Batts, Toney and Melton reject the notion that Mississippi has turned away from a "consumer expectations" analysis.

"Risk-Utility" Analysis
In a "risk-utility" analysis, a product is "unreasonably dangerous" if a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product. Thus, even if a plaintiff appreciates the danger of a product, he can still recover for any injury resulting from that danger provided that the utility of the product is outweighed by the danger that the product creates. Under the "risk-utility" test, either the judge or the jury can balance the utility and danger-in-fact, or risk, of the product. Steven G. Davison, The Uncertain Search for a Design Defect Standard, 30 Amer.Univ. L.R. 643, 654 (1981); See also John W. Wade, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825 (1973).
The two most recent cases in Mississippi on products liability law speak to a "risk-utility" analysis. In Hall v. Mississippi Chemical Exp., Inc., 528 So.2d 796 (Miss. 1988), this Court appeared to move away from the "consumer expectations" analysis of products liability. Hall, like all of the products liability cases before it, followed State Stove in adhering to Section 402A as Mississippi's law for strict liability. However, this Court then stated:

*255 The proper focus in a strict liability case is upon the utility and safety of the product in view of its intended function rather than on the manufacturer's fault or lack thereof.
Id. at 799.
Prestage argues that this is clearly a step away from the "consumer expectations" analysis. He argues that whether an ordinary consumer expected or contemplated the dangerousness of a particular product has little or no relevance on whether that level of dangerousness is reasonable in view of the product's intended function.
This Court again made reference to "risk-utility" in Whittley v. City of Meridian, 530 So.2d 1341 (Miss. 1985). In Whittley, as in Hall, this Court acknowledged 402A as the law for products liability in Mississippi. The Court then stated:
In determining whether a product is unreasonably dangerous a reasonable person must conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product.
Id. at 1347. Again, Prestage argues that this is clearly a step away from the "consumer expectations" analysis.
In holding that Mississippi adheres to a "consumer expectations" test, the U.S. Court of Appeals for the Fifth Circuit discussed the language of Hall and Whittley. In Melton, 887 F.2d at 1241, the Fifth Circuit rejected the idea that Whittley (and presumably Hall, as well) changed products liability law in Mississippi from a "consumer expectations" analysis to that of "risk-utility."
Melton has suggested that Mississippi may employ a test for unreasonable dangerousness other than that based on consumer expectations. In support of this contention Melton cites Whittley v. City of Meridian [cite omitted], a strict liability case in which the Supreme Court of Mississippi made the following statement:
In determining whether a product is unreasonably dangerous a reasonable person must conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product.
[cite omitted]. Such a "risk-utility" test for unreasonable dangerousness is distinct from the "consumer expectations" test discussed above, and does not necessarily bar recovery when a danger is open and obvious. [citations omitted]. We cannot say, however, that Mississippi has altered its doctrine of strict liability. Whittley quoted section 402A of the Restatement as the law of Mississippi [cite omitted]. The sentence to which Melton points was merely a description following that quote. It was unaccompanied by any discussion of unreasonable dangerousness, the "consumer expectations" test, or the "risk-utility" test. Furthermore, that section of the opinion discussed a defense based on an intervening cause; the court did not actually apply the risk-utility test. Thus, we cannot conclude from this single sentence that Mississippi has adopted a new test for unreasonable dangerousness. Accordingly, consumer expectations are still the basis of Mississippi's test, and there is still no strict liability for a patent danger.

Id. at 1243. (Emphasis added). Melton has subsequently been followed by Toney, 975 F.2d at 162, and Batts, 978 F.2d at 1386.
Around the country, the test generally employed to determine liability for products defects is the "risk-utility" test developed by Dean Wade. W. Kip Viscusi, Wading Through the Muddle of Risk-Utility Analysis, 39 Amer.L.R. 573, 574 (1990); See also Kim Larsen, Strict Products Liability and the Risk-Utility Test for Design Defect: An Economic Analysis, 84 Colum.L.R. 2045, 2046 (1984) (stating that in recent years, the "risk-utility" test has replaced the "consumer expectations" test in defective design cases). "Risk-utility" has become the trend in most federal and state jurisdictions.[2]

*256 "Consumer Expectations" vs. "Risk-Utility"

This Court has clearly moved away from a "consumer expectations" analysis and has moved towards "risk-utility." Consistent with the national trend, the two most recent decisions of this Court applied a "risk-utility" analysis to strict products liability. It is true that the Fifth Circuit has held in Melton, Toney and Batts that Mississippi applies a "consumer expectations" test despite the language in Hall and Whittley. However, Fifth Circuit decisions, while quite persuasive in their authority, are not binding on this Court. It is this Court's province to decide matters of state law.

4.
A "risk-utility" analysis best protects both the manufacturer and the consumer.[3] It does not create a duty on the manufacturer to create a completely safe product. Creating such a product is often impossible or prohibitively expensive. Instead, a manufacturer is charged with the duty to make its product reasonably safe, regardless of whether the plaintiff is aware of the product's dangerousness. This is not to say that a plaintiff is not responsible for his own actions. In balancing the utility of the product against the risk it creates, an ordinary person's ability to avoid the danger by exercising care is also weighed.[4]

5.
There is sufficient evidence to show that Prestage tried his case under a "risk-utility" analysis. It is also clear from the record that the trial court understood "risk-utility" to be the law in Mississippi and applied that test correctly. Sperry's motions for summary judgment, directed verdict, J.N.O.V., and its request for peremptory instruction were all properly denied.

Issue B: The court erred in refusing Sperry's "Failure to Warn" Instruction, D-20.

1.
Sperry contends that the trial court denied it a fundamental defense when its "Failure to Warn" Instruction, D-20, was refused. The proposed instruction provided:

*257 Where an adequate warning is given, the product maker may reasonably assume that it will be read and followed; and a product bearing such an adequate warning, which is safe for use if it is followed, is not in a defective condition or unreasonably dangerous. Thus, if you find from the evidence in this case that Sperry-New Holland gave an adequate warning and in spite of this warning, John Paul Prestage used the combine in a manner inconsistent with the warning, causing his injuries, then your verdict must be for Sperry-New Holland.

2.
Sperry claims the following warnings were in the operator's manual and/or on the combine:
Remember a careful operator is the best insurance against an accident. Extreme care should be taken in keeping the hands and clothing away from moving parts.
Stop machine to adjust and oil.
When mechanism becomes clogged, disconnect power before clearing.
Keep hands, feet and clothing away from power driver parts.
Sperry argues that under Mississippi law, a "failure to warn" instruction must be given. It contends that the trial court offered no justification for its refusal of this instruction and the elimination of the instruction constituted reversible error.
Prestage argues that the operator's manual did not contain any directions on what to do in the event of clogging. Furthermore, he argues that Sperry's own expert witness, Edwin Matthews, testified to the insignificance of warnings, stating:
Warnings are a third-rate way of preventing accidents. As I said before, warnings are something that, in my opinion, the operators read once, and forget.
Even assuming Sperry did provide adequate warnings, Prestage argues that a manufacturer of an unreasonably dangerous product ought not escape liability as a matter of law simply by providing a warning if the danger can be completely eliminated by a slight change in the design of the product.

3.
The trial judge evidently refused this instruction because he did not believe that misuse, or use in a manner inconsistent with the warning, was a complete bar to recovery. From the other instructions the jury was informed that Prestage's misuse of the combine should be considered in determining whether Sperry was liable.[5] The jury instructions, read together, properly instructed the jury under a "risk-utility" analysis and the exclusion of Instruction D-20 was not reversible error.

Issue C: The court erred in not granting a mistrial after Prestage attempted to admit certain John Deere safety committee minutes even though the court held them inadmissible.

1.
Sperry contends that the trial court committed reversible error in refusing to grant a mistrial concerning references to certain John Deere Safety Committee Meetings.
One of Prestage's expert witnesses, Gary Robinson, testified that Sperry could have put a grate in the bottom of the tank at a minimal cost which would have prevented Prestage's injury. On direct examination of this expert, Robinson made no reference to the John Deere Safety Committee Minutes. Sperry complains that when it cross-examined Robinson, he gave "pre-programmed" testimony which amounted to an improper admission of hearsay. The *258 testimony to which Sperry refers is as follows:
[Sperry] You have done no studies or tests on such a grate to determine whether there would be problems with bridging with that grate; have you?
[Robinson] I haven't personally, but I've seen the extensive studies that John Deere did over a ten year period.
Q. Sir, on that grate, you don't know of any manufacturer that used a grate during the time period that this combine, 1969, was designed and manufactured, correct?
A. That is correct. John Deere worked on their grating from about 1970 to '78.
Q. Sir, that was after this combine was manufactured; correct?
A. Sure.
Q. And Deere never used that grate, correct?
A. They used it out in the field. They never used it in production.
Sperry did not object to Robinson's statements while on cross-examination. On redirect, Prestage asked Robinson, "Do you have any information concerning testing of that grate idea as far as whether it is feasible?" Sperry immediately objected and asked for a bench conference. The trial judge sustained Sperry's objection on the grounds of hearsay.
Sperry argues that with the above testimony Prestage impermissibly informed the jury that John Deere studied the feasibility of the grate system over a substantial period of time, and forced Sperry to object and ask for a bench conference which "ran" the jury out of the room. Sperry argues that all of this tended to leave an impression that the John Deere Safety Committee Minutes were unfavorable to it.
Prestage responds that Sperry asked the question on cross-examination which "opened the door" to Robinson's response, and that Sperry did not object to the response when the answer was received. Finally, Prestage argues that on the redirect question by Prestage, Sperry objected before Robinson could respond to his question, thereby negating any prejudicial effect on the jury.
Sperry further contends that even though the trial court sustained its objection prohibiting testimony about the John Deere minutes from being admitted, Prestage pressed on. Sperry then moved for a mistrial or alternatively that the trial judge instruct the jury that Prestage's comments were inappropriate, were previously discussed and ruled inadmissible. Both requests were denied.

2.
West Cash & Carry Bldg. Materials v. Palumbo, 371 So.2d 873 (Miss. 1979) is very similar to the case sub judice. On cross-examination by defense counsel, a witness made an inadmissible reference to insurance before the jury. Defense counsel failed to object at that time. After a lunch break, however, the defendant moved for a mistrial claiming that a contemporaneous objection would have been an unwise trial tactic which would have drawn the jury's attention to the comment on insurance. The trial court overruled the motion for mistrial because it was untimely and because defense counsel elicited the unwanted response. This Court held that our jurisprudence has long favored the contemporaneous rule and that if defense counsel believed his case was prejudiced, he needed to contemporaneously ask that the jury be admonished. This Court gives great deference to the trial judge in determining whether prejudice has occurred, stating, "[t]he trial judge whose duty it is to be attuned to the trial as it progresses is in the most advantageous position to correctly rule whether prejudice, or the lack of it, has emanated from the comment of a witness." West Cash & Carry, 371 So.2d at 876. See also Copiah Dairies, Inc. v. Addkison, 247 Miss. 327, 153 So.2d 689, 694 (1963).
Sperry argues that Williams v. State, 539 So.2d 1049 (Miss. 1989), requires reversal of this case. In this child abuse case, the prosecutor moved to introduce a videotape of an interview of the victim to rebut an attack on the victim's credibility. The motion was overruled and the jury was *259 instructed to disregard any references to the video tape. Thereafter, out of the jury's presence, the State again tried and failed to introduce the tape. Subsequently, the prosecutor on numerous occasions moved for the introduction of the videotape, in blatant disregard of the trial court's ruling of inadmissibility. This Court held that the defendant was denied a fair trial because the State's continuous remarks led the jury to perceive that actions by the defense counsel kept incriminating evidence from them. In so ruling, this Court quoted from 88 C.J.S. Trials, § 162 (1955) as follows:

Acceptance of court's rulings. Counsel should accept the court's rulings on the admission of evidence, and it is highly improper for him to persist in asking a question or questions, or to adhere to questioning along the same line, where the court has already ruled against him, unless the question was excluded as being merely out of time, or unless the court was not positive and certain in its rulings.
Williams, 539 So.2d at 1051.
Williams is distinguishable in two ways. First, the action by the offending party in Williams was clearly more egregious. In the case sub judice, only three references were made about the John Deere minutes, one of which was elicited by Sperry on cross-examination and not objected to. Second, Williams was a criminal case. The rights of the defendant to a fair trial are more closely guarded than in a civil trial.

3.
The testimony concerning the John Deere minutes was limited at best. The trial judge felt that the brief references to the John Deere minutes did not merit a mistrial. Because the judge is in the best position to correctly rule on whether prejudice had emanated from comments of a witness, his decision should be given great deference. Seeing no extraordinary circumstances in the record which merit reversal, his decision is upheld.

Issue D; The court erred in refusing to let Sperry impeach Edgar "Red" Prestage, Sr. with a prior inconsistent statement.

1.
Less than two weeks after the accident, Red's liability insurer took a recorded statement from him regarding the events of the accident. In this statement, Red speculated that Prestage was down in the grain tank at the time of the accident. Red's statement is as follows:
[Insurer]. Alright, uh, to your knowledge what happened after that to your knowledge?
[Red]. Well the way I see it, uh, the combine had some uh trash in it and the unloadin' auger wudn't pickin' the trash up, dumpin' over the tra-, I mean with the clean wheat (Un hunh) and uh its, what it looked like to me, Butch got over in the unloadin' 
Q. When you say Butch, that's Johnny, right?
A. John Paul, yeah. (O.K. go ahead) got over in the uh grain bin with it runnin' and kicked that wheat down, to kick it down, make it go in see its just a little crack about this wide (O.K.) on each side of the shield (O.K.) and it feeds in to keep too much from goin' down chokin' your auger (O.K.) and it looked like to me he got over in there to kick that on in there and make it unload it. It's pretty good pile probably looked like to me its 'bout fifteen, twenty bushels left in the grain bin.
Q. O.K., so the accident actually occurred in the grain bin and not in the header?
A. That's right.
Q. So he climbed up into the grain bin, (Yeah) was kickin' it down to make it feed better?
A. Yeah.
During trial, however, Red testified that he investigated the accident the same afternoon or the very next day and:
[Red]. And then I didn't really know where or what had happened, really, and I got up on the back and I saw a piece of shirt hanging on the grain leveling bin auger shaft. And I took it off and found *260 out it was hang on a bolt that secured a section of the grain bin leveling auger.
The trial court refused to permit Sperry to impeach Red with his prior statement to his insurer because the statement was in the form of an opinion and was not independently admissible. However, the court did admit the remaining part of Red's statement to his insurer (not included above), most of which concerned Red's knowledge of the machine and instructions he gave to Prestage in the use of the machine.
Sperry claims that for purposes of impeachment, it is legally unimportant whether the testimony is characterized as opinion or fact. The proper inquiry, according to Sperry, is whether the testimony sought to be introduced is inconsistent with the testimony given by the witness.
Prestage argues that there is nothing in Red's prior statement that is in any way inconsistent with his trial testimony. He claims that while it is true that Red did not mention anything about finding a shirt on the leveling auger in his statement to his insurer, Red's later statement at trial detailed only how he learned of the accident, not how he speculated the accident had happened.

2.
A witness's unsworn prior inconsistent statement may be used for impeachment of the witness's credibility regarding his testimony on direct examination. Miss.Rule Evid. 613(b)[6]; Moffett v. State, 456 So.2d 714, 719 (Miss. 1984). It is generally held that a statement "is inconsistent if under any rational theory it might lead to any relevant conclusion different from any other relevant conclusion resulting from anything the witness said." Marcum v. Mississippi Valley Gas Co., 587 So.2d 223, 226 (Miss. 1991). However, a prior statement made by one not a party may not be used as substantive evidence. Moffett, 456 So.2d at 719. When a statement is not being introduced as substantive evidence, it is not being "offered for the truth of the matter asserted" but merely to show that the declarant made the statement. "As such it is relevant regardless of its truth and it does not matter that the trier of fact is unable to ascertain the declarant's credibility." Marcum, 587 So.2d at 225.
There is no prohibition on opinion testimony as long as it is relevant. The admission or exclusion of relevant testimony is largely within the discretion of the trial judge, Federal Land Bank of Jackson v. Wolfe, 560 So.2d 137, 140 (Miss. 1989); Independent Life & Acc. Ins. Co. v. Peavy, 528 So.2d 1112, 1119 (Miss. 1988), and this Court will reverse only if an abuse of discretion has occurred. Nationwide Mutual Insurance Co. v. Evans, 553 So.2d 1117, 1119 (Miss. 1989). Great deference is given to a trial court's decision on the admission or exclusion of evidence due to relevance. Seeing no abuse of discretion in this case, the trial court's decision on the admission or exclusion of evidence due to relevance. Seeing no abuse of discretion in this case, the trial court's decision is upheld.

Issue E: The court erred in precluding the evidence that Prestage had settled with his father, Edgar "Red" Prestage, Sr.

1.
In Prestage's original complaint he sued his father, Red, contending that his father owned the combine and that his father's negligence was a proximate cause of his injuries. Before jury selection, Prestage and Red's liability insurer settled. The trial court allowed Edwin Matthews, who was originally Red's expert but became Sperry's expert under subpoena after Red settled, to testify that he was hired by "a defendant" who had nothing to do with Sperry, but ruled that Matthews could not *261 say that he had previously been Red's expert.
Sperry argues that evidence of the fact that suit was filed against Red and evidence of Prestage's statements in interrogatories and depositions that Red was negligent was admissible to impeach Prestage's testimony that Sperry's combine was the sole proximate cause of Prestage's injuries. Prestage argues that his allegation that Red was negligent and a proximate cause of his injuries was simply an alternative plea which cannot be used to impeach his testimony.

2.
Alternative pleading is allowed under Miss.R.Civ.P. 8(e).[7] It is not alleged that Prestage violated Rule 8(e). Instead, Sperry argues that Prestage's allegation and statements in interrogatories and depositions supporting the allegation that Red's actions were a proximate cause in the accident were inconsistent with Prestage's trial testimony that Sperry was the sole proximate cause of his injuries. Sperry's argument is what Rule 8(e) intends to prevent and Rule 8(e) governs. Prestage was simply alleging and supporting alternative theories of recovery. Sperry's argument has no merit.

Issue F: The court erred in precluding opinion evidence of experts Nooyen and Poindexter that Prestage was down in the grain tank prior to the accident.

1.
Sperry argues that its experts, Ray Nooyen and Will Green Poindexter, were erroneously prevented from giving their opinion that Prestage was down in the tank immediately before the accident. Sperry introduced posed photographs of Prestage down in the tank. It wanted to use Nooyen and Poindexter to help prove that it would have been impossible for Prestage to reach the stick in the way he said he did and that he was really voluntarily down in the tank at the time of the accident. By motion in limine, Prestage moved to exclude the testimony of Nooyen and Poindexter claiming that their opinions were not supported by credible facts and they had not given any credible grounds to support their opinions. Prestage then argued during pre-trial that neither Nooyen nor Poindexter were accident reconstructionists and neither were qualified to render an opinion that Prestage was down in the grain bin at the time of the accident. The court ruled that any conclusions that might be reached from a photograph could be urged by counsel and an expert was not needed. The following exchange commenced:
MR. ULMER [Sperry]: It certainly is a conclusion we will urge to the jury.
THE COURT: But that doesn't mean that some expert has to render that conclusion. The facts are there and they are there for everybody to see. The jury can reach that conclusion.
MR. ULMER: That's the whole purpose for an expert, though.
THE COURT: No, sir. That's not the purpose of an expert. It most explicitly is not the purpose of an expert. The expert is to explain things the jury might not understand.

2.
Sperry was allowed to prove through another expert that it would be highly unlikely that Prestage could have reached the stick in the way he said he did. Edwin Matthews testified that he attempted to recreate Prestage's actions but, despite being taller than Prestage, had great difficulty *262 reaching the stick. The trial court's denial of Nooyen and Poindexter's testimony was harmless error, if it was error at all.

Issue G: The court erred in not granting Sperry's motions for directed verdict because the combine was not in substantially the same condition on the date of the accident as it was when it left Sperry's possession.

1.
In reviewing a denial of a motion for directed verdict, this Court applies the standard stated in Litton Systems, Inc. v. Enochs, 449 So.2d 1213 (Miss. 1984). Under this standard, this Court will:
[C]onsider the evidence in the light most favorable to the appellee, giving that party the benefit of all favorable inference that may be reasonably drawn from the evidence. If the facts so considered point so overwhelmingly in favor of the appellant that reasonable men could not have arrived at a contrary verdict, [we are] required to reverse and render. On the other hand if there is substantial evidence in support of the verdict, that is, evidence of such quality and weight that reasonable and fair minded jurors in the exercise of impartial judgment might have reached different conclusions, affirmance is required.
Id. at 1214.

2.
In order to recover under a strict liability theory, Prestage must prove that the defect which proximately caused his injuries existed at the time the combine left Sperry's possession. BF Goodrich, Inc. v. Taylor, 509 So.2d 895, 903 (Miss. 1987). It is undisputed that the guard on the discharge auger was designed to provide a space between 2 and 4 inches to let grain come through to the auger. Prestage's expert, Robinson, found the opening to be 4 1/4 to 5 inches. Another one of Prestage's experts, Graham Wells, found the opening was up to 5 inches wide. Based on this evidence alone, Sperry argues that the trial court should have granted a directed verdict in its favor.
Sperry claims that, as a matter of law, a deformity of the auger guard of up to one inch proves that the combine has been altered and, therefore, shows that its combine was not defective. This is simply not so. Sperry's own expert, Matthews, testified as follows:
Q. You told us in you deposition, didn't you sir that aside from normal expected wear and tear, you didn't find anything different about the auger than there would have been when they left New Holland, the manufacturers [sic], didn't you sir?
A. I believe I did.
* * * * * *
Q. So, other than normal, expected wear and tear, the shields were just like they left the manufacturer?
A. Except the type shield being warped somewhat. It was warped like that the first  both times I saw it.
Q. But that was normal wear and tear; wasn't it Mr. Matthews?
A. I believe that you could call it normal wear and tear for an old combine. It had been running a long time.
Considering this testimony in the light most favorable to Prestage, there is ample evidence upon which reasonable minds could differ. The trial court's denial of Sperry's motion for directed verdict is upheld.

Issue H: The court erred in excluding evidence as to the overall condition of the combine.

1.
The admission or exclusion of evidence due to relevance is largely within the discretion of the trial judge. Federal Land Bank of Jackson v. Wolfe, 560 So.2d 137, 140 (Miss. 1989); Independent Life & Acc. Ins. Co. v. Peavy, 528 So.2d 1112, 1119 (Miss. 1988). This Court will reverse only if an abuse of discretion has occurred. Nationwide Mutual Insurance Co. v. Evans, 553 So.2d 1117, 1119 (Miss. 1989).

*263 2.
Prestage moved in limine to preclude Sperry from proving the overall condition of the combine based on the grounds of relevancy and undue prejudice. Sperry sought to introduce evidence that portions of the combine unrelated to the area in which the plaintiff was injured had fallen into a state of disrepair and that certain guards had been removed over the life of the machine. The trial court sustained Prestage's objection to the evidence finding that the presence or absence of shields and guards in other places were not relevant. This decision is clearly within the province of the trial court and finding no abuse of discretion, the judge's decision is upheld.

Issue I: The court erred in giving plaintiffs' special interrogatories.

1.
Sperry argues that special interrogatories to the jury were drafted by Prestage but not tendered until the court considered the instructions. Because the instruction conference was immediately followed by the reading of the jury instructions and final argument, Sperry alleges Prestage gained a tactical advantage. Apparently, Sperry's concern is not with the content of the special verdict form, but rather it is concerned with Prestage's timing in presenting the verdict form.

2.
The parties' arguments were made before the trial court and the judge found no error in the giving of the special verdict form. In matters left to the trial court's discretion, this Court gives great deference to the judge's decision. Since manifest error cannot be shown from the record, the judge's decision is upheld. Nationwide Mutual Insurance Co. v. Evans, 553 So.2d 1117, 1119 (Miss. 1989).

Issue J: The jury verdict is excessive and this Court should enter a remittitur or remand for a new trial on damages.

1.
"Our general rule [is] that great deference must be given to the fact finder, and our ventures into the jury's province are greatly restricted." Detroit Marine Engineering v. McRee, 510 So.2d 462, 471 (Miss. 1987). This Court further stated in Detroit Marine that in reviewing other jury awards:
[W]hile seeking such similarities may be helpful to our overall research, we are guided (if not limited) by the court's decision handed down in Woods v. Nichols, 416 So.2d 659 (Miss. 1982), in which we determined that each suit for personal injury must be individually decided on its own particular facts.
Id. at 471.

2.
Sperry argues that Prestage did not present sufficient evidence to warrant the jury's award and asks this Court to enter a remittitur or a new trial on the issue of damages. Specifically, Sperry argues that Prestage failed to support his claim of $560,000 in lost future income. Sperry also claims that the jury's award is grossly out of line with factually similar cases.
The jury, in rendering its verdict by special interrogatory, found affirmatively that Sperry was both strictly liable and negligent in its design of the combine. It also found that Prestage was 35 percent comparatively negligent in causing his injury. After the jury awarded John Prestage $1,425,000.00 and Pam Prestage $218,750.00, the trial judge entered a verdict, after reduction by 35 percent, of $883,250, plus interest at 8 percent per annum from date of the judgment of April 16, 1990, in favor of John Paul Prestage and a verdict of $135,187.50, plus interest, for Pam Prestage, together with all costs.

3.
The jury awarded only a general sum of money and did not separate the different elements of damages that Prestage claimed in his original complaint. Not knowing what persuaded the jury to award Prestage the amount of money that it did, any attempt *264 to now separate the award into specific elements of damage would be pure speculation on our part. Prestage presented expert testimony and proof of his income at the time of the accident, his life expectancy and his anticipated lost future income. What effect this has on the damage award is a matter for the jury to decide.
After a review of factually similar cases, this Court finds that it was well within the jury's province to award damages in the above amount and its decision is hereby upheld.[8]
AFFIRMED.
HAWKINS, C.J., DAN M. LEE, P.J., and SULLIVAN, PITTMAN, McRAE and ROBERTS, JJ., concur.
McRAE J., concurs by separate written opinion, joined by SULLIVAN, J.
BANKS and SMITH, JJ., not participating.
McRAE, Justice, concurring:
While I applaud the majority's adoption of the risk-utility analysis in strict liability cases, I write separately to express my concern about the trial judge's reduction of the jury's award of damages to reflect John Paul Prestage's comparative negligence.
The Prestages sued Sperry-New Holland on two theories of law: strict liability and negligence. The jury, which rendered its verdict by special interrogatory, found that Sperry was strictly liable as well as negligent in its design of the combine. It further found that Prestage was thirty-five percent contributorily negligent. Thus, the trial judge reduced the jury's award of $1,425,000.00 to Prestage by thirty-five percent to $883,250.00. The amount awarded to Pam Prestage for loss of consortium was similarly reduced.
Strict liability and negligence are two separate and distinct torts, as the diagrams below illustrate:

Under the theory of strict liability, a plaintiff need only prove three elements: defect, causation and damages. Fault is applied as a matter of law. Toliver v. General Motors Corp., 482 So.2d 213, 215 (Miss. 1985). It is the product, not the consumer or the user, that is being tried. In a negligence action, the plaintiff, in contrast, must establish the existence of a duty, a breach of that duty, causation and damages. We explained this distinction in Hall v. Mississippi Chemical Express, Inc., 528 So.2d 796 (Miss. 1988), noting that "[t]he *265 proper focus in a strict liability case is upon the utility and safety of the product in view of its intended function rather than on the manufacturer's fault or lack thereof." Id. As further distinguished from the negligence cause of action, open and obvious or comparative negligence are not affirmative defenses to strict liability. Rudisaile v. Hawk Aviation, Inc., 92 N.M. 575, 577, 592 P.2d 175, 177 (1979). "The existence of due care on the part of the consumer is irrelevant." Id.; Berkebile v. Brantly Helicopter Corporation, 462 Pa. 83, 337 A.2d 893 (1975). Since negligence is not an element considered under the strict liability theory, any defenses a defendant would use to attack a claim of negligence are not applicable. Therefore, the award of damages in a strict liability case cannot be reduced by any comparative negligence on the part of the plaintiff. Under the strict liability theory, the product is being tried, not the user or the consumer.
Unfortunately, the Prestages did not seek a reinstatement of the full verdict and that matter is not before us now. However, as I read the majority opinion, it appears that, with regard to the award of damages, the negligence theory is allowed to take precedence over the Prestages' successful strict liability argument. This is not correct. When a plaintiff raises both strict liability and negligence arguments and the jury finds that he has met the burden of proof on both theories, he is entitled to the full damages awarded to him. An award of damages made on the basis of strict liability cannot be reduced by the assertion of an affirmative defense which is not available as a defense to that particular tort.
SULLIVAN, J., joins this opinion.
NOTES
[1] See Ford Motor Company v. Cockrell, 211 So.2d 833 (Miss. 1968); Ford Motor Co. v. Dees, 223 So.2d 638 (Miss. 1969); Falstaff Brewing Corp. v. Williams, 234 So.2d 620 (Miss. 1970); Coleman v. Ford Motor Co., 240 So.2d 607 (Miss. 1970); Hatcher v. American Motors Comp., 241 So.2d 147 (Miss. 1970); General Motors Corp. v. Howard, 244 So.2d 726 (Miss. 1971); Smith v. Temco, Inc., 252 So.2d 212 (Miss. 1971); Mid-South Packers, Inc. v. Gould, 263 So.2d 785 (Miss. 1972); Hamilton Fixture Corp. v. Anderson, 285 So.2d 744 (Miss. 1973); Ford Motor Co. v. Matthews, 291 So.2d 169 (Miss. 1974); Early-Gary, Inc. v. Walters, 294 So.2d 181 (Miss. 1974); Baker v. Ford Motor Co., 317 So.2d 51 (Miss. 1975); William Cooper and Nephews, Inc. v. Pevey, 317 So.2d 406 (Miss. 1975); Cadillac Corp. v. Moore, 320 So.2d 361 (Miss. 1975); Parker v. Ford Motor Co., 331 So.2d 923 (Miss. 1976); Ford Motor Co. v. Broadway, 374 So.2d 207 (Miss. 1979); Frauhauf Corp. v. Trustees of First, Etc., 387 So.2d 106 (Miss. 1980); Thomas v. Munson Machiner Co., Inc., 463 So.2d 1044 (Miss. 1985); Nichols v. Western Auto Supply Co., Inc., 477 So.2d 261 (Miss. 1985); Toliver v. General Motors Corp., 482 So.2d 213 (Miss. 1985); Rose v. Mercury Marine, A Division of Brunswick, 483 So.2d 1351 (Miss. 1986); Coca-Cola Bottling Co., Inc. v. Reeves, 486 So.2d 374 (Miss. 1986); Hattiesburg Coca-Cola Bottling Co. v. Barrett, 497 So.2d 809 (Miss. 1986); Brown v. Williams, 504 So.2d 1188 (Miss. 1987); BF Goodrich, Inc. v. Taylor, 509 So.2d 895 (Miss. 1987); Detroit Marine Engineering v. McRee, 510 So.2d 462 (Miss. 1987); Hall v. Mississippi Chemical Exp., Inc., 528 So.2d 796 (Miss. 1988); Whittley v. City of Meridian, 530 So.2d 1341 (Miss. 1988); Holifield v. Pitts Swabbing Co., 533 So.2d 1112 (Miss. 1988).
[2] See Issac Montal, The Consumer Expectations Test in New Jersey: What Can Consumers Expect Now?, 54 Brooklyn L.R. 1381, 1381 (1989) (see cases cited at 1381, n. 1); James Henderson, Jr. and Aaron Twerski, Stargazing: The Future of American Products Liability Law, 66 N.Y.U.L.R. 1332 (1991) (see cases cited at 1335, n. 19).
[3] In balancing a product's utility against the risk of injury it creates, a trial court may find it helpful to refer to the seven factors enumerated in Professor John Wade's article, On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 825. The factors are:

(1) The usefulness and desirability of the product  its utility to the user and to the public as a whole.
(2) The safety aspects of the product  the likelihood that it will cause injury, and the probable seriousness of the injury.
(3) The availability of a substitute product which would meet the same need and not be as unsafe.
(4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
(5) The user's ability to avoid danger by the exercise of care in the use of the product.
(6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
(7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.
Id. at 837-838.
[4] and Obvious" Defense
Under the "patent danger" rule, "a product that has an open and obvious danger is not more dangerous that contemplated by the consumer, and hence cannot, under the consumer expectation test applied in Mississippi, be unreasonably dangerous." Toney, 975 F.2d at 165 (quoting Melton, 887 F.2d at 1243).
Having here reiterated this Court's adoption of a "risk-utility" analysis for products liability cases, we hold, necessarily, that the "patent danger" bar is no longer applicable in Mississippi. Under a "risk-utility" analysis, the "patent danger" rule does not apply. In "risk-utility," the openness and obviousness of a product's design is simply a factor to consider in determining whether a product is unreasonably dangerous. Wade, 44 Miss.L.J. 837-838; W. Keeton, D. Dobbs, R. Keeton, and D. Owen, Prosser and Keeton on the Law of Torts § 99 at 698-99 (5th ed. 1984). See also Melton, 887 F.2d at 1243 (stating that under "risk-utility," the patent danger rule does not necessarily bar recovery).
[5] Instruction D-23, in particular, incorporates some of the warnings on the combine. The instruction is as follows:

If you believe from the evidence in this case that John Paul Prestage was negligent in leaving the operator's platform with the engine running and the unloading auger and leveling auger engaged, or in failing to turn off the leveling auger before exposing himself to it, or in the manner in which he exposed himself to the leveling auger or unloading auger, and if you believe that such negligence, if any, was the sole proximate cause of his injuries, then your verdict must be for Sperry-New Holland.
[6] RULE 613. PRIOR STATEMENTS OF WITNESSES.

(b) Extrinsic Evidence of Prior Inconsistent Statement of Witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate him thereon, or the interests of justice otherwise require. This provision does not apply to admissions of a party-opponent as defined in Rule 801(d)(2).
[7] Rule 8(e) is as follows:

(e) Pleading to Be Concise and Direct: Consistency.
(1) Each averment of a pleading shall be simple, concise, and direct. No technical forms of pleading or motions are required.
(2) A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses. When two or more statements are made in the alternative and one of them if made independently would be sufficient, the pleading is not made insufficient by the insufficiency of one or more of the alternative statements. A party may also state as many separate claims or defenses as he has, regardless of consistency. All statements shall be made subject to the obligations set forth in Rule 11.
[8] It is important to note that the jury's damage award to Prestage was reduced by 35 percent due to John Prestage's comparative negligence. This Court, however, has never definitively stated that comparative negligence is applicable to strict liability cases. See Nichols v. Western Auto Supply Co., Inc., 477 So.2d 261 (Miss. 1985); Braswell v. Economy Supply Co., 281 So.2d 669 (Miss. 1973). This is, indeed, an important question that courts from around the nation have grappled with. But because this issue was not raised on appeal and is not before us, this Court declines to address it and affirms the reduced amount of damages.