# UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

## No. 94-60539
_____

**MELODY WILLIAMS, Individually and as Next Friend of
Sherman Marion Williams, ET AL.,**

                        **Plaintiffs-Appellants,**

**VERSUS**

**BRIGGS COMPANY, ET AL.,**

                        **Defendants,**

**STANDARD ENTERPRISES and THERM-O-DISC, INC.,**

                        **Defendants-Appellees.**

_____

### Appeal from the United States District Court
### for the Southern District of Mississippi

_____
August 21, 1995

Before WISDOM, DUHÉ, and BARKSDALE, Circuit Judges.

RHESA HAWKINS BARKSDALE, Circuit Judge:

Melody Williams, et al., appeal from a judgment as a matter of law. We **AFFIRM**.

### I.

On May 23, 1991, Summer Jewel Williams, Melody Williams' 11-month old daughter, was severely burned by water in a bathtub in Melody Williams' apartment in Vicksburg, Mississippi. While Melody Williams was in the kitchen, her three-year-old son began to fill the bathtub with hot water. Melody Williams heard the running water, and told her son to turn it off. Immediately thereafter,

and before her son did so, Melody Williams heard a splash, followed by screams from her daughter.  Melody Williams found her daughter in the bathtub in at least several inches of hot water.  Summer Jewel Williams' treating physician estimated that she had sustained partial thickness (second degree) burns on 43% of her body.  She died several days later from an infection resulting from the burns.

Suit was filed against, among others, Therm-O-Disc, Inc., the manufacturer of the thermostat on the water heater, and Standard Enterprises, the manager of the apartment building; trial was held against only those two defendants.  On their motion for judgment as a matter of law at the close of Williams' case, the district court found that Williams had failed to offer sufficient proof on any of her theories of recovery, including strict product liability and negligence, and therefore granted the motion.

## II.

In this diversity action, we must, of course, apply Mississippi law.  Subsumed within the challenge to the judgment as a matter of law are whether the thermostat manufactured by Therm-O-Disc was defectively designed, evidentiary rulings by the district court, and the proper rule of decision under Mississippi law for a landlord's liability for a defect on its premises.  Needless to say, we freely review a judgment as a matter of law, and must view the evidence in the light most favorable to the nonmoving party. *E.g.*, **Boeing Co. v. Shipman**, 411 F.2d 365, 374-75 (5th Cir. 1969).

A.

For strict product liability, Mississippi requires the plaintiff, *inter alia*, to demonstrate that the product was "in a *defective condition unreasonably dangerous* to the user or consumer". **Sperry-New Holland v. Prestage**, 617 So. 2d 248, 253 (Miss. 1993) (emphasis in original) (quoting **Restatement (Second) of Torts** § 402A). And, for determining whether a product is unreasonably dangerous, Mississippi has made it clear recently that it applies a risk-utility analysis. *Id*. Under that analysis, "a product is 'unreasonably dangerous' if a reasonable person would conclude that the danger-in-fact, whether foreseeable or not, outweighs the utility of the product." *Id*. at 254. Mississippi law further advises:

> In balancing a product's utility against the risk of injury it creates, a trial court may find it helpful to refer to the seven factors enumerated in Professor John Wade's article, **On the Nature of Strict Tort Liability for Products**, 44 **Miss. L.J.** 825. The factors are:
>
> (1) The usefulness and desirability of the product - its utility to the user and to the public as a whole.
>
> (2) The safety aspects of the product - the likelihood that it will cause injury, and the probable seriousness of the injury.
>
> (3) The availability of a substitute product which would meet the same need and not be as unsafe.
>
> (4) The manufacturer's ability to eliminate the unsafe character of the product without impairing its usefulness or making it too expensive to maintain its utility.
>
> (5) The user's ability to avoid danger by the exercise of care in the use of the product.

> (6) The user's anticipated awareness of the dangers inherent in the product and their avoidability, because of general public knowledge of the obvious condition of the product, or of the existence of suitable warnings or instructions.
>
> (7) The feasibility, on the part of the manufacturer, of spreading the loss by setting the price of the product or carrying liability insurance.
>
> *Id*. at 837-838.

*Id*. at 256 n.3.

The only strict product liability claim urged here is that the water heater thermostat, manufactured in 1973, was defectively designed, in that its upper setting, 170 degrees, is too high for residential use. Against the above risk-utility backdrop, Williams states that a corollary to her claim "is whether there is any utility whatever to a design which would allow a water heater to heat residential hot water to 170" degrees. Leonard Mandell, Williams' expert in the fields of mechanical engineering, thermodynamics, and heat transfer, testified that he knew of no household use for 170 degree water; in his opinion, a thermostat capable of that setting is unreasonably dangerous.[1]

The district court's duty, as well as ours, is not to determine whether there is *any* evidence supporting Williams' claim, but whether there is sufficient evidence to support a verdict in her favor. *See* Fed. R. Civ. P. 50(a)(1); ***Boeing Co.***, 411 F.2d at 374-75. Williams asserts that Mandell's testimony was sufficient

---

[1] Mandell maintained that household water should not exceed 130 degrees.

- 5 -

to warrant submission of the case to the jury.  As discussed below, we agree with the district court that it was not.

To begin with, any discussion regarding the utility of 170 degree water is largely irrelevant in this case.  According to Mandell's highest estimation, the water in the bathtub at the time of the accident was 155 degrees, and was perhaps as low as 145 degrees.  Other evidence suggests the water was less than 140 degrees.[2]  As such, the focus of the case narrows, and our question is not the utility, *vel non*, of 170 degree water, but of 140-155 degree water.

On *this* utility question, Mandell acknowledged that widely-accepted industry standards called for 140 degree water in residential dishwashers and washing machines.  He also noted "a very excellent reference book" that requires temperatures as high as 160 degrees for certain household dishwashing needs.  Another of Williams' exhibits notes that manufacturers of washing machines have recommended 165 degree water.

Another of Williams' experts, Dr. Richard Forbes, noted an additional benefit of Therm-O-Disc's thermostat:  by permitting the

---

[2]     Summer Jewel Williams received partial thickness (second degree) burns from, by Mandell's estimation, four to six seconds of exposure to the water. (Mandell originally estimated six to ten seconds.)  However, according to charts which Mandell recognized as respected authority, at only 140 degrees *adult* skin will receive full thickness (third degree) burns in four to six seconds.  Given that Summer Jewel Williams received second, not third, degree burns, and Mandell's admission that a child's skin would burn faster than an adult's, there is a strong indication that the water was less than 140 degrees.  A temperature of 140 degrees is consistent with the opinion of Summer Jewel Williams' treating physician.

water heater to produce water that is hotter than needed, that water can be combined with cold water at the faucet to produce *more* water of an appropriate temperature.  Dr. Forbes suggested that this was an important function, given the limited capacity of most residential water heaters.

This common sense application may be one reason why industry safety standards in 1973 (when the thermostat was manufactured) permitted thermostats with settings of 170 degrees.  Although not conclusive, Therm-O-Disc's compliance with industry standards certainly weighs in our analysis.  *See* **William Cooper & Nephews, Inc. v. Pevey**, 317 So. 2d 406, 409-10 (Miss. 1975) (Reversing a jury verdict for plaintiff when, among other things, defendant's product was "within the range of United States Department of Agriculture regulations").  In this regard, however, Mandell was of the opinion that all water heater thermostats were defective.

Finally, Mandell and Dr. Forbes recognized that there is always temperature loss between the water heater and the faucet. Mandell testified that the heat loss in this case from the water heater to the bathtub would be "[i]n the order of five degrees". The implication is unmistakable:  a higher thermostat setting is necessary to compensate for heat loss, among other things, between the water heater and the faucet.  (Obviously, other factors, such as length of time of the water in the bathtub, have a bearing on heat loss.  Although the thermostat was set for 170 degrees, Mandell estimated that the water temperature in the bathtub was no greater than 155 degrees, a drop of at least ten degrees more than

the estimated five degree loss between the water heater and faucet.)

Against the considerable utility of Therm-O-Disc's thermostat, we must also examine the risk of injury associated with it. As noted by the Mississippi Supreme Court, "[i]n balancing the utility of the product against the risk it creates, an ordinary person's ability to avoid the danger by exercising care is also weighed." *Prestage*, 617 So. 2d at 256. No reasonable jury could disagree that an "ordinary person" is capable of avoiding the danger presented by Therm-O-Disc's thermostat. Williams essentially agreed. She testified that she always turned the hot and cold water on together when filling the bathtub. Perhaps, as a result, she had never before complained that the water in her apartment was too hot.

This points up another means by which the consumer may protect herself: the thermostat was adjustable. Therm-O-Disc's design allowed for an adjustment of temperature as the consumer saw fit. In this connection, notwithstanding Mandell's testimony that an ordinary person has no conception of how hot water of a given temperature is, we think an ordinary person is fully aware of when water is too hot for his liking, and can protect himself accordingly.

Obviously, Williams' 11-month old daughter was incapable of exercising care for her own safety. But, it goes without saying that manufacturers cannot make an absolutely safe product, especially for 11-month old children. *See* **Prestage**, 617 So. 2d at

256 (noting that the risk-utility analysis "does not create a duty on the manufacturer to create a completely safe product").

Indeed, herein lies the balancing mandated by the risk-utility analysis. In that balance, the fact is that households require hot water, often very hot water, for various uses. Williams' water heater produced water temperatures, at the faucet, in the range of temperatures suggested for some household applications. Under these circumstances, upon application of the risk-utility factors suggested by the Mississippi Supreme Court, we hold that no reasonable jury could conclude that the design of the Therm-O-Disc thermostat was unreasonably dangerous.

## B.

Two evidence claims are presented. We address them, before turning to the substantive (negligence) claim against Standard Enterprises, the apartment manager.

## 1.

Williams challenges the district court's refusal to allow certain evidence regarding an alleged malfunction of the water heater and thermostat. We review only for an abuse of discretion. *E.g*, *Esposito v. Davis*, 47 F.3d 164, 168 (5th Cir. 1995); *Shipp v. General Motors Corp.*, 750 F.2d 418, 427 (5th Cir. 1985).

More than two years after the accident, Dr. Forbes conducted a test with the water heater from the Williams' apartment which, according to Dr. Forbes, revealed a malfunction of the lower thermostat, causing the water to overheat. The district court refused to admit this evidence, on the basis that Williams did not

sustain her burden of demonstrating that, at the time of the test, the water heater was in substantially the same condition as at the time of the accident. *See Barnes v. General Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977) (requiring tests to be conducted under "substantially similar" conditions to those at the time of the accident; burden of proof on party seeking to introduce evidence); *United States v. Gaskell*, 985 F.2d 1056, 1060 (11th Cir. 1993).

The record supports this ruling. Various repairs were made to the water heater between the accident and the test. Moreover, there appears to have been at least some confusion as to the exact nature of those repairs. And, needless to say, the passage of two years certainly contributed to the district court's concern over the reliability of the test. Even Dr. Forbes was unable to provide any assurance to the district court that the conditions for his test were substantially similar to those at the time of the accident.

We need not linger long over the parties' debate about the precise significance of the repairs to the water heater, or the two-years' use between accident and testing. These matters are left to the sound discretion of the district court.[3] *Shipp*, 750

_____

[3] Moreover, Forbes' test sought to demonstrate that the water heater malfunctioned to produce water of nearly 200 degrees. This appears most inconsistent with the evidence of the conditions in the bathtub at the time of the accident; the water was at most 155 degrees. Even taking into account the heat loss from water heater to bathtub, it would not seem that 200-degree water at the water heater would have cooled to 155 degrees in the bathtub, in light of the fact that the water had apparently not been running for a long period, was still running at the time of the accident, and was being accumulated in the bathtub (apparently, toys at the drain were blocking it), and, therefore, had not been allowed to cool

F.2d at 427; **Barnes**, 547 F.2d at 277. That discretion was not abused.

2.

At trial, Williams claimed that, if Dr. Forbes' test evidence was not admitted, she was entitled to a spoliation of evidence inference against Standard Enterprises, the apartment manager, for its failure to preserve the condition of the water heater. The district court denied the claim, finding, *inter alia*, that Williams, not Standard Enterprises, was largely to blame for the condition of the water heater.

Even assuming that the district court was **Erie**-bound to apply Mississippi law on this point, we find no reversible error. Williams cites two Mississippi cases, **Delaughter v. Lawrence County Hosp.**, 601 So. 2d 818 (Miss. 1992) and **Bott v. Wood**, 56 Miss. 136 (1878), to support her spoliation claim. Although both support the general proposition that spoliation occurs when a party fails to fulfill a duty to preserve evidence, neither has any bearing in this instance. Unlike in **Delaughter** and **Bott**, the evidence in issue, the water heater, was not destroyed or lost. *See* **Delaughter**, 601 So. 2d at 821 (defendant hospital lost plaintiff's medical records); **Bott**, 56 Miss. at 136-37 (intentionally destroyed document). Furthermore, Williams offered no evidence to suggest that Standard Enterprise did anything to alter the condition of the water heater, other than allow it to remain in the apartment and continue in operation. And, as the district court noted, at any

_____

significantly.

- 11 -

time following the accident, Williams could have taken steps to secure the water heater.

## C.

Williams' claim against her apartment manager (landlord), Standard Enterprises, was for negligence -- its failure to warn of, or correct, the alleged defective condition of the water heater. Williams contends that the district court applied the wrong rule of decision in granting judgment as a matter of law in favor of Standard Enterprises. In light of our having rejected the claim that the water heater was defective because the water temperature was too high, and our having upheld the evidentiary rulings (including on the spoliation claim) bearing on the alleged defective condition of the water heater, it is most questionable whether a negligence claim remains against the landlord. In any event, we reject it as well.

The district court ruled:

> In Mississippi a landlord's breach of his covenant to generally repair the rented premises or its contents does not render him liable for personal injuries to the tenant ... unless it appears that at the time of the lease that this premises contained, to the landlord's knowledge, some dangerous hidden defect or defects unknown to or concealed from the tenant and which the tenant could not have discovered by a voluntary inspection.

Finding insufficient evidence that the accident resulted from a defect known by Standard Enterprises, the district court granted judgment as a matter of law.

Williams insists that, in 1991, in *O'Cain v. Harvey Freeman & Sons*, 603 So. 2d 824 (Miss. 1991) (en banc), the Mississippi

Supreme Court adopted a more stringent standard for landlords, requiring them to exercise reasonable care in discovering any hidden defects on their premises -- essentially, a duty to inspect. Williams bases this contention on the concurring opinion in **O'Cain**. *See* **Id**. at 831-33 (Sullivan, J., concurring). Assuming, *arguendo*, that the concurring opinion endorses Williams' position[4], the *opinion of the en banc court* clearly rejected it: "A landlord is liable for latent defects *which he knows about and conceals or being aware of the defect, he fails to inform the tenant*." **Id**. at 830 (emphasis in original) (quoting **Loflin v. Thornton**, 394 So. 2d 905, 906 (Miss. 1981)).  Accordingly, we cannot agree that the concurrence has changed Mississippi law.[5]  And, absent such a change, Williams does not contend that she is otherwise entitled to relief on this claim.

### III.

For the foregoing reasons, the judgment is

**AFFIRMED**.

---

[4]    The **O'Cain** concurrence concludes:

> I advocate that the bare minimum standard for an implied warranty of habitability should require a landlord to provide reasonably safe premises at the inception of a lease, and to exercise reasonable care to repair dangerous defective conditions upon notice of their existence by the tenant, unless expressly waived by the tenant.

**O'Cain v. Harvey Freeman & Sons**, 603 So. 2d 824, 833 (Miss. 1991).

[5]    Williams notes that a majority joined the concurring opinion. This is indeed an anomaly; but, when faced with inconsistent holdings between the "opinion of the court" and a concurrence, we must follow the former.

- 13 -