United States Court of Appeals
Fifth Circuit

**F I L E D**

**March 1, 2004**

Charles R. Fulbruge III
Clerk

Revised March 16, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 03-60007

---

ELIZABETH CROWDER AUSTIN,
Individually, and as Administratrix
of the Estate of Andrew C. Austin,
Deceased; HEIDI ELIZABETH AUSTIN;
FRANK BARKSDALE AUSTIN,

                              Plaintiffs-Appellants,

     versus

WILL-BURT COMPANY; ET AL,

                              Defendants,

WILL-BURT COMPANY,

                              Defendant.

---

Appeal from the United States District Court
for the Northern District of Mississippi

---

Before GARWOOD, JONES, and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

     In this products liability diversity case, plaintiffs-
appellants Elizabeth Crowder Austin, et. al., (appellants), appeal
the summary judgment dismissal of their action against defendant-
appellee Will-Burt Co. (Will-Burt) for damages for the wrongful

death of their decedent, Andrew Austin[1].  We affirm.

**Facts and Proceedings Below**

Andrew Austin (Austin) was a twenty-four year old college graduate in his fourth month as a production manager for television station WABG-TV (WABG) in Greenville, Mississippi.  On June 17, 1997, Austin was assigned to set up the station's electronic news gathering (ENG) van for a live broadcast in downtown Greenville, in front of the City Hall.  His duties typically included operating the Will-Burt telescoping mast that was mounted on the van in order to facilitate the broadcast.  The mast, which fed through a hole in the roof of the van, was constructed of aluminum tubes nestled inside each other that could be extended by air pressure.  On the day in question, the van was parked by someone other than Austin underneath power lines.  When the mast was raised, it became entangled with the power lines, sending 8,000 volts through the mast and electrifying the van and its appurtenances.  When Austin touched the van, he received a fatal electric shock.

No federal or state statute or regulations or similar requirements (such as OSHA or American National Standard Institute standards) dictate how telescoping masts should be constructed, perform or operate.  Will-Burt masts are used by the military,

_____

[1] Initially, appellants filed suit against multiple defendants.  However, all defendants other than Will-Burt were either dismissed from the case or settled their claims with the appellants.  Therefore, this opinion is limited to the only defendant involved in this appeal, Will-Burt.

2

Border Patrol, firefighters, and the television industry. However, each sector uses the masts for a somewhat different purpose.

The telescoping mast at issue was manufactured in 1982 by the Ohio-based Will-Burt, and in May of that year was sold by Will-Burt to Quality Coach, a company in Indiana that purchased component parts and integrated them into vehicles pursuant to the demands of an end user. Will-Burt did not do business with Quality Coach after 1984 or 1985. In December 1988 WABG purchased the mast, as a separate item, from Alan W. Haines, Custom Construction of Monroeville, New Jersey, the invoice reflecting that it was "used" and "completely rebuilt." Will-Burt was unaware, until a time after the accident in question, that WABG had acquired the mast. In 1989 or 1990 WABG in a separate transaction or transactions acquired from one or more sources other than Will-Burt (and other than Haines) a pan-and-tilt and microwave antenna, neither of which were manufactured or sold by Will-Burt (which does not make or sell items of that kind). The pan-and-tilt and microwave antenna house the movable camera and transmitting antenna that are to be placed on the top of a telescoping mast.

WABG had a 1985 ENG van which it had purchased from a third party (Will-Burt did not and does not make or sell such vans). In 1990, WABG, through its own employees, "integrated" into its ENG van the mast and separate "payload components, which included a Quick Set pan-and-tilt and a microwave antenna." That process

3

involved cutting a hole in the top of the van, affixing the mast to the floor of the van where it could extend through that hole, and attaching the separate "pan-and-tilt and the antenna to the top of the mast." The WABG employee that performed this work was at that time "aware of the risk that the telescoping mast could be raised into overhead power lines" and he "therefore placed two warning plaques on the van," one "on the dashboard of the van" and the other "near the lever that activated the telescoping mast," stating "something to the effect of 'check around the van before raising the mast and look for all overhead obstructions.'" These two plaques were in addition to the "warnings [sic] sign[s] that came affixed to the Will-Burt telescoping mast that warned of overhead danger as well."

Although Will-Burt originally sold the mast with a constant pressure switch, which required an operator to continuously depress the switch in order to raise or lower the mast, when WABG integrated the mast into its ENG van, it rigged a bungee cord to hold down the pressure switch. The bungee functioned as a crude remote control, enabling the mast to be raised and lowered without a person physically applying constant pressure.

Austin's surviving mother, individually and as Administratrix of his estate, father, and sister, filed this wrongful death and survival products liability action in 2000 against Will-Burt and other defendants in Mississippi state court, alleging as to Will-

4

Burt that at the time the mast left Will-Burt's control, it was defective in design, and that Will-Burt failed to provide adequate warnings or instructions. They further alleged respecting Will-Burt that it breached its post-sale duty to warn end-users like WABG about the dangers posed by its product, in light of its knowledge of five or six post-1982 deaths by electrocution involving its masts.[2] The case was removed to federal court on diversity grounds. The parties agree that Mississippi substantive law governs this case.

On November 20, 2002, the district court granted Will-Burt's motion for summary judgment, dismissing all of the appellants' claims against it. Judgment for Will-Burt was certified as final under FED. R. CIV. P. 54(b). Appellants have timely appealed.

**Discussion**

1.  Standard of Review

We review the district court's grant of summary judgment *de novo*, applying the same legal standards as the district court applied to determine whether summary judgment was appropriate. *Ramirez v. City of San Antonio*, 312 F.3d 178, 181 (5th Cir. 2002). A summary judgment motion is properly granted only when, viewing the evidence in the light most favorable to the nonmoving party, the record indicates that there is no genuine issue as to any

---

[2]Breach of warranty allegations were also made below, but appellants have not raised any such claims on this appeal.

material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 106 S.Ct. 2552, 2552-54 (1986). In determining whether there is a genuine dispute as to any material fact, we must consider all of the evidence in the record, but we do not make credibility determinations or weigh the evidence. *Ramirez*, 312 F.3d at 181. Instead, we should draw all reasonable inferences in favor of the nonmoving party. *Id*. However, the nonmovant, to avoid summary judgment as to an issue on which it would bear the burden of proof at trial, may not rest on the allegations of its pleadings but must come forward with proper summary judgment evidence sufficient to sustain a verdict in its favor on that issue. *Celotex Corp.,* 106 S. Ct. at 2552-53; *Hypes v. First Commerce Corp*., 134 F.3d 721, 725 (5th Cir. 1998); *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994).

2.  Mississippi Products Liability Act

In *Sperry-New Holland v. Prestage*, 617 So. 2d 248, 252-56 (Miss. 1993), the Mississippi Supreme Court rejected the "consumer expectations" test which it had earlier applied in products liability cases and adopted instead the "risk-utility" analysis.[3]

_____

[3]The *Prestage* Court noted that "[i]n *Hall v. Mississippi Chem. Exp., Inc.*, 528 So. 2d 796 (Miss. 1988), this Court appeared to move away from the 'consumer expectations' analysis of products liability," and also observed that *Whittley v. City of Meridian*, 530 So. 2d 1341 (Miss. 1988), likewise represented "a step away from the 'consumer expectations' analysis."

6

Accordingly, *Prestage* also rejected the "consumer expectation test" driven doctrine that an "open and obvious danger" could not render a product defective. *Prestage*, 617 So. 2d at 256 n.4. *Prestage* was decided March 25, 1993. "Soon thereafter, the Legislature passed the Products Liability Act, Miss. Code Ann. § 11-1-63." *Smith v. Mack Trucks, Inc.*, 819 So. 2d 1258, 1261 (Miss. 2002). The substantive provisions of the Mississippi Products Liability Act (MPLA) are inapplicable to cases *filed* before July 1, 1993, the effective date of the MPLA, and such cases are governed by *Prestage*. *Smith* at 1261-64. All cases filed after July 1, 1993, are fully governed by the MPLA. Because the instant suit was filed after July 1, 1993, it is fully governed by the MPLA.

The MPLA provides that:

"In any action for damages caused by a product except for commercial damage to the product itself:
    (a) The manufacturer or seller of the product shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
        (i)1. The product was defective because it deviated in a material way from the manufacturer's specifications or from otherwise identical units manufactured to the same manufacturing specifications, or

---

*Prestage*, 617 So. 2d at 254, 255. *Prestage* expressly declined to follow decisions of this court which "held that Mississippi employs a 'consumer expectations' standard in strict products liability cases," citing *Batts v. Tow-Motor Forklift Co.*, 978 F.2d 1386 (5th Cir. 1992); *Toney v. Kawasaki Heavy Indus. Ltd.*, 975 F.2d 162 (5th Cir. 1992); *Melton v. Deere & Co.*, 887 F.2d 1241 (5th Cir. 1989); and *Gray v. Manitowoc Co., Inc.*, 771 F.2d 866 (5th Cir. 1985). *Prestage,* 617 So. 2d at 254, 256.

2. The product was defective because it failed to contain adequate warnings or instructions, or

3. The product was designed in a defective manner, or

4. The product breached an express warranty or failed to conform to other express factual representations upon which the claimant justifiably relied in electing to use the product; and

(ii) The defective condition rendered the product unreasonably dangerous to the user or consumer; and

(iii) The defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."

Miss. Code. Ann. § 11-1-63(a).

In this appeal, appellants do not raise any contentions under section (i)1 (manufacturing defect) or section (i)4 (express warranty or representation), but rely only on claims of inadequate warning (section (i)2) and defective design (section (i)3).

Concerning defective warning claims (section (a)(i)2) the MPLA provides:

"(c)(i) In any action alleging that a product is defective because it failed to contain adequate warnings or instructions pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller, the manufacturer or seller knew or in light of reasonably available knowledge should have known about the danger that caused the damage for which recovery is sought and that the ordinary user or consumer would not realize its dangerous condition.

(ii) An adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product, taking into account the characteristics of, and the ordinary

8

knowledge common to an ordinary consumer who purchases the product; or in the case of a prescription drug, medical device or other product that is intended to be used only under the supervision of a physician or other licensed professional person, taking into account the characteristics of, and the ordinary knowledge common to, a physician or other licensed professional who prescribed the drug, device or other product." Miss. Code Ann. § 11-1-63(c),

and,

"(e) In any action alleging that a product is defective pursuant to paragraph (a)(i)2 of this section, the manufacturer or seller shall not be liable if the danger posed by the product is known or is open and obvious to the user or consumer of the product, or should have been known or open and obvious to the user or consumer of the product, taking into account the characteristics of, and the ordinary knowledge common to, the persons who ordinarily use or consume the product." Miss. Code Ann. § 11-1-63(e).

As to design defect claims (section (a)(i)3) the MPLA provides:

"(b) A product is not defective in design or formulation if the harm for which the claimant seeks to recover compensatory damages was caused by an inherent characteristic of the product which is a generic aspect of the product that cannot be eliminated without substantially compromising the product's usefulness or desirability and which is recognized by the ordinary person with the ordinary knowledge common to the community." Miss. Code Ann. § 11-1-63(b),

and,

"(f) If any action alleging that a product is defective because of its design pursuant to paragraph (a)(i)3 of this section, the manufacturer or product seller shall not be liable if the claimant does not prove by the preponderance of the evidence that at the time the product left the control of the manufacturer or seller:
(i) The manufacturer or seller knew, or in light of reasonably available knowledge or in the exercise of reasonable care should have know, about the

9

danger that caused the damage for which recovery is sought; and

(ii) The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code Ann. § 11-1-63(f).[4]

## 3. Inadequate Warning Claim

The appellants claim that the mast at issue was defectively designed and unreasonably dangerous when it left Will-Burt's control in May 1982 because of inadequate warnings. The district court dismissed this claim, noting that the warning labels that were placed on the mast specifically cautioned the operator that he or she could be killed if the mast were raised "near" power lines.[5] In Mississippi, a warning may be held adequate as a matter of law where the adverse effect was one that the manufacturer specifically warned against. *Cather v. Catheter Tech. Corp.*, 753 F.Supp. 634, 640 (S.D. Miss. 1991).

---

[4]The MPLA also provides that "nothing in this section shall be construed to eliminate any common law defense to an action for damages caused by a product." Miss. Code Ann. § 11-1-63(h).

[5]The labels, which were yellow with red and black lettering, were affixed to the base of the mast, and stated:
- DANGER! PLEASE READ INSTRUCTIONS BEFORE RAISING!
- DANGER. WATCH FOR WIRES. YOU CAN BE **KILLED** IF THIS PRODUCT
  COMES NEAR ELECTRICAL POWER LINES.

There were also warnings in product manuals which Will-Burt supplied with its masts not to raise the mast under or near power lines and to check for overhead obstructions in proximity to the mast's line of extension and maximum height.

The warnings on the mast clearly connected contact with power lines and risk of death. Moreover, to the extent this danger was not already obvious, we refer to the testimony of Donnie Reid, the operations manager at WABG who conducted Austin's safety training and trained him in setting up the "live truck." Reid warned Austin that before raising the mast he should check that the truck was on level ground, check for obstacles overhead such as trees and power lines, never raise the mast if there were overhead obstacles, and maintain a twenty-foot clearance from any power lines. Furthermore, on the day in question Reid specifically told Austin that he did not need to raise the mast to do the shot from the City Hall location.[6]

The warnings on the mast (see note 5 above) seem clearly adequate, particularly "taking into account . . . the ordinary knowledge common to an ordinary consumer who purchases the product." Miss. Code Ann. 11-1-63(c)(ii). In any event, the uncontradicted evidence establishes that Austin was adequately warned of the danger he encountered using the mast and that that danger was either "known" or "open and obvious" to him (and certainly "should have been known or open and obvious" to him). Miss. Code Ann. § 11-1-63(e) provides that with respect to claims under paragraph (a)(i)2 – governing liability for inadequate

_____

[6] The mast did not need to be raised when WABG did live shots from this location because the station's antenna was within the direct, unobstructed line of sight of the Greenville City Hall.

11

"warnings or instructions" – "the manufacturer or seller shall not be liable if the danger . . . is known or is open and obvious to the user . . . or should have been known or open and obvious." *See also, e.g.*, *City of Jackson v. Ball*, 562 So. 2d 1267, 1270 (Miss. 1990) ("the dangerous product user need give no further warning after the contractor . . . has actual knowledge of the danger. *Mississippi Chem. Corp. v. Rogers*, 368 So. 2d [220] at 222 [Miss. 1979] ('knowledge of danger by an independent contractor relieves the owner from the duty of warning the independent contractor *or his employees*')") (emphasis by *Ball*); *Sprankle v. Bower Ammonia & Chem. Co.*, 824 F.2d 409, 412 (5th Cir. 1987) ("in an action for negligent failure to warn, there is no right to recover where the party to be warned is already aware of the danger;" and, "'there is no duty to warn when the user has actual knowledge of the danger.'" [quoting *Hobart v. Sohio Petroleum Co.*, 255 F. Supp. 972, 975 (N.D. Miss. 1966), *aff'd*, 376 F.2d 1011 (5th Cir. 1967)]); *Gray v. Manitowoc*, 771 F.2d 866, 868 (5th Cir. 1985) ("'No duty rests upon a manufacturer or seller to warn a purchaser of a dangerous design which is obvious,'" quoting *Harrist v. Spencer-Harris Tool Co.*, 140 So. 2d 558, 562 (Miss. 1962)).[7]

_____

[7]In its unanimous opinion in *Materials Transp. Co. v. Newman*, 656 So. 2d 1199, 1203 (Miss. 1995), the Mississippi Supreme Court states that, in *Tharp v. Bunge Corp.*, 641 So. 2d 20, 25 (Miss. 1994), and *Prestage*, 617 So. 2d at 256 n.4, it had held that "'open and obvious'" or "'patent danger'" defenses "no longer" barred recovery in product liability cases whether based

There is also the matter of proximate cause. Under Miss. Code Ann. § 11-1-63(a)(i)2 and (iii) the plaintiff clearly has the burden to prove that the claimed failure to adequately warn was a proximate cause of the accident in question. *See Wolf v. Stanley Works*, 757 So. 2d 316, 323 (Miss. App. 2000) (proximate cause not shown where "there was no evidence that desired warning would have had any causative impact," citing *Wyeth Labs., Inc. v. Fortenberry*, 530 So. 2d 688, 691 (Miss. 1988)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994) (en banc) ("plaintiff must show that adequate warning would have altered conduct," citing *Fortenberry*, 530 So. 2d at 691). Where the party to be warned has been informed of the danger, the manufacturer's failure to warn thereof is not shown to be a proximate cause, at least absent evidence that a manufacturer's warning would have changed that party's conduct. *Fortenberry*, 530 So. 2d at 691. *See also Id.* at

---

on negligence (*Tharp*) or on strict liability (*Prestage*). *Materials Transport*, however, makes the following observation, viz:

> "This Court notes that the legislature has reestablished both the open and obvious danger doctrine and the assumption of the risk doctrine as bars to recovery in products liability actions if the product allegedly fails to adequately warn a consumer of its danger. Miss. Code Ann. § 11-1-63(d, e) (Supp. 1994) (effective July 1, 1993)." *Id*. at 1203 n.1.

The Court there further notes that the MPLA was inapplicable because the trial court's judgment was rendered before July 1, 1993. *Id*. In both *Tharp* and *Prestage* the actions were filed before July 1, 1993, and hence the substantive provisions of the MPLA were inapplicable. *Smith*, 819 So. 2d at 1261-64.

13

691-92 (citing with approval *Kirsch v. Picker Int'l, Inc.*, 753 F.2d 670, 672 (8th Cir. 1985) ("there is simply no evidence that Dr. Murphy did not know of the danger in using radiation therapy. On the contrary, the only evidence is that he had such knowledge. Any failure to warn by Picker would not have been the proximate cause of Kirsch's injuries")). Here the uncontradicted evidence is that Reid adequately warned Austin. In light of this, and in the absence of any contrary evidence, it cannot be assumed that any further warning by Will-Burt would have altered Austin's conduct. Thus, appellants' failure to warn claims must also fail because proximate cause has not been shown.

4. Post-Sale Duty to Warn

Appellants also claim a post-sale duty to warn. This claim fails for the same reasons discussed in section 3 above. Additionally, we conclude that the MPLA precludes imposition on a manufacturer or seller of a post-sale duty to warn (at least where detrimental reliance on a manufacturer's or seller's post-sale warning is not involved). This appears to be required by the provision of Miss. Code Ann. § 11-1-63(a) that:

> "the manufacturer or seller . . . *shall not be liable* if the claimant does not prove . . . that *at the time the product left the control of the manufacturer or seller*:
> (i)1. . . ., or
> 2. *The product was defective because it failed to contain adequate warnings or instructions*, or
> 3. . . ., or
> 4. . . ." (emphasis added).

Similarly, section 11-1-63(c)(i) provides that with respect to

14

claims of inadequate "warnings or instructions pursuant to paragraph (a)(i)2 . . . the manufacturer or seller shall not be liable if the claimant does not prove . . . that *at the time the product left the control of the manufacturer or seller*, *the manufacturer or seller knew or . . . should have known*" of the danger posed by the product and that the ordinary user or consumer would not realize its dangerous conditions (emphasis added).

We agree with the Mississippi Court of Appeal's statement in *Palmer v. Volkswagen of Am., Inc.*, 2003 WL 22006296 at *31 (Miss. Ct. App. Aug. 26, 2003) that "the plain meaning of the MPLA's language is that the statute imposes liability on the manufacturer or seller for warnings that were inadequate at the time of sale, not for warnings that became inadequate at some later time."[8]

5. Design Defect

Appellants claim that the Will-Burt mast was defectively designed in two respects, namely that it did not have a proximity warning device (PWD) and that it was not insulated.[9]

---

[8]As *Palmer* also observes, there is apparently no other Mississippi decision (or case applying Mississippi law), either before or after the MPLA, addressing the post-sale duty to warn issue.

[9]Appellants also assert that the mast's design was defective because it lacked a remote control device. The district court concluded that, because the bungee cord attached to the lever operated as remote control by overriding the constant pressure switch and allowed Austin to raise the mast while sufficiently outside of the truck to adequately observe the power lines above the mast as it rose, and Austin raised the mast by using the bungee cord while outside the truck, that accordingly there was

15

(a) PWD

Appellants claim that the mast should have had a PWD which would have either given a warning sound or signal, or stopped the mast from continuing to rise, when the mast came within a certain distance of a power line. Will-Burt has manufactured and sold such a device, called a D-Tec, starting in 1998; it commenced attempting to develop the D-Tec in 1996 and produced a prototype which it exhibited at the April 1997 National Association of Broadcasters convention. Thereafter, it made some improvements to the D-Tec and began selling it in September 1998. The only other PWD referenced in the evidence is the Sigalarm, manufactured by another company. It was first used in the broadcast industry in 1995 or 1996. PWDs used in the broadcast industry or in ENG vans are and were sold by the manufacturer either to van assembling companies, which then sell the van with mast, payload, and PWD to broadcasters, or are sold directly to the station, which does its own integration. The PWD is a separate item, not a part of the mast itself, and is affixed on top of the mast payload (the pan-and-tilt and antenna) which itself sits on the top of the mast. The pan-and-tilt and antenna are likewise items separate from the mast itself and are manufactured by companies other than mast manufacturers. The cost

no evidence to sustain a finding that the lack of remote control device was a proximate cause of the accident. On appeal plaintiffs point to no evidence to the contrary and essentially fail to address this matter. Accordingly, we reject this aspect of appellants' design defect claim (and need not and do not consider whether it would otherwise have merit).

of a PWD is and has been approximately 28 to 30 percent of the cost of the mast.  In 1998 Will-Burt unsuccessfully attempted to sell its D-Tec PWD to WABG, which declined to purchase it and continued to use its van without a PWD.  As early as the 1960s or 1970s Sigalarm manufactured a form of PWD which was used on cranes respecting the horizontal movement of the crane boom.  Prior to 1995 the only use of PWDs on elevating masts was the use by the Border Patrol, which in 1984 or 1985 first began placing of a modified form of Sigalarm PWD on elevating masts, on top of which the Border Patrol would mount infrared sighting devices used to view aliens crossing the border at night.[10]

(b) Insulation

With respect to insulation, the summary judgment evidence

---

[10]The Border Patrol in 1983 requested the Immigration and Naturalization Service research and development field office to "develop a surveillance device that would get an infrared telescope off the ground to where they could provide a wider area of surveillance" and "[they] needed some way to warn the operator when he was working at night that there was a power line in the vicinity."  A Sigalarm PWD used on cranes was acquired and was modified "by trial and error" to be suitable for a vertically elevating mast.  At the top of the elevating mast was a Quick Set pan-and-tilt, then the infrared sighting device, and at the very top the PWD.  Further modifications to the PWD were made in 1986 and 1987 to eliminate an operator controlled off-switch and to address the problem of "nulls" where the electromagnetic field from two or more power lines balances out so the PWD does not give a signal.  As so modified, Sigalarm PWDs continued to be used in these Border Patrol surveillance vehicles.  Will-Burt elevating masts were used, but Will-Burt did not furnish, or assemble to the mast, the pan-and-tilt, the surveillance antenna, or the PWD.

17

showed that telescoping masts were not and never had been insulated. The only exception to this was that commencing in 1985 Will-Burt made some telescoping masts, through not for ENG vans, the top tube of which was of fiberglass (rather than metal, which the rest of the mast was). This was apparently done for military surveillance devices. Although fiberglass is nonconductive (at least unless dirty or wet) it was not used to avoid anticipated problems of electricity coming into the mast, or for related safety reasons, but to avoid interference with separate communications devices that were placed on top of the mast. In the late 1990s Will-Burt began working on the development of an entirely non-metallic, non-conductive telescoping mast, a prototype being first built in 1999 or 2000, but the project was abandoned and no such masts were produced or sold. Moreover, if the pan-and-tilt and antenna, which sit on top of the mast and extend horizontally from it a distance considerably greater than the diameter of the mast, came into contact with a live electrical wire the current would pass down wires (contained in the "nycoil" that runs around the mast and connects with the camera and antenna on the pan-and-tilt) to the base of the mast and the van. The summary judgment evidence showed without contradiction that neither telescoping masts used in the broadcast industry or in ENG vans, nor pan-and-tilt devices, nor their cameras or antennas, were or had ever been insulated.

    (c) Discussion

The MPLA, section 11-1-63(f), provides with respect to a claim "that a product is defective because of its design pursuant to paragraph (a)(i)3" that "the manufacturer . . . *shall not* be liable if the claimant does not prove . . . *that at the time the product left the control of the manufacturer* . . . (ii) *The product failed to function as expected and* there existed a feasible design alternative that would have to a reasonable probability prevented the harm" (emphasis added).

In *Wolf v. Stanley Works*, 757 So. 2d 316, 321 (Miss. App. 2000), the court observed that "the risk-utility test for determining whether a product contains a design defect" set out in *Prestage* "has probably been replaced by the statutory command that there is no liability unless the product 'failed to perform as expected.'" (citing § 11-1-63(f)(ii)). We conclude that the MPLA, in section 11-1-63(f), unambiguously precludes recovery against the manufacturer on the basis of design defect unless the product "failed to function as expected," and that this preclusion of recovery is applicable even though the facts are such that design defect recovery against the manufacturer would have been available under the *Prestage* risk-utility test notwithstanding that the product functioned as expected.[11]    Two other preliminary

---

[11]In certain cases, the functioning of the product as expected will be a factor in precluding design defect recovery as a matter of law even under the *Prestage* risk-utility analysis. *See, e.g., Cooper v. General Motors Corp.*, 702 So. 2d 428, 442-444 (Miss. 1997).  *See also Williams v. Briggs Co.*, 62 F.3d 703

19

observations are appropriate in this regard.  First, the MPLA makes plain that the "failed to function as expected" requirement is to be applied as of "the time the product left the control of the manufacturer or seller."  *Id*. § 11-1-63(f).[12]  Under the undisputed facts here, the relevant time is accordingly May 1982, when Will-Burt sold the elevating mast to Quality Coach.  Second, the MPLA makes it plain that in claims of design defect the *plaintiff* has the burden to prove that the product failed to function as expected when it left the manufacturer's control. § 11-1-63(f) (manufacturer "shall not be liable if the claimant does not prove . . . that at the time the product left the control of the manufacturer . . . [t]he product failed to function as expected").[13]

The "failed to function as expected" requirement of section 11-1-63(f) appears to largely reinstate for design defect cases a frequently expressed requirement of the "consumer expectations test" which *Prestage* had abrogated in favor of the broader "risk-utility" test.  *See, e.g.*, *Prestage*, 617 So. 2d at 254 ("[i]n a 'consumer expectations' analysis, ordinarily the phrase 'defective

---

(5th Cir. 1995).

[12]See also § 11-1-63(a) (precluding recovery unless one of the four specified defects or conditions exists "at the time the product left the control of the manufacturer or seller").

[13]See also § 11-1-63(a) (manufacturer "shall not be liable if the claimant does not prove . . . that at the time the product left the control of the manufacturer" it was defective in one of four specified ways).

condition' means that the article has something wrong with it, that it did not function as expected;" internal quotations and citations omitted).  *See also*, *e.g., Todd v. Societe Bic S.A.*, 21 F.3d 1402, 1406-07 (7th Cir. 1994) (en banc); *Hernandez v. Tokai Corp.*, 2 S.W.3d 251, 260-62 (Tex. 1999).[14]

---

[14]In *Todd* the Seventh Circuit applied Illinois law to hold that as a matter of law there could be no recovery against the manufacturer of a disposable cigarette lighter for damages resulting from a fire caused by the purchaser's four year old child using the lighter to ignite some papers on the floor which resulted in a serious home fire.  The claim was that the lighter was defectively designed because it had no child-resistant features, it concededly being feasible to make a lighter with such features.  The court held that the lighter was not for that reason (or any other) defective under the "consumer contemplation" test of section 402A Restatement (2nd) Torts and its comment i because the lighter did not fail to function as expected, notwithstanding that the home fire which it caused was *not* expected.  The court stated "[t]he *consumer contemplation test* separates defective products from the universe of ordinary products which may be involved in causing injury.  *Under the test, a product is only considered defective or unreasonably dangerous if it fails to perform in a manner the ordinary consumer would expect*."  *Id*. at 1406-07 (emphasis added).  The court further noted that while the lighter might be defective in design under the risk-utility test, Illinois would not apply that test to a simple product such as the lighter.  *Id*. at 1409-12. In *Hernandez v. Tokai Corp.*, 2 S.W. 3d 251 (Tex. 1999), another non-child-resistant lighter case, the Texas Supreme Court held that whether the lighter was unreasonably dangerous should be determined under the "risk-utility" test, not the consumer-contemplation test, noting that risk-utility factors are set out in the Texas statute (Tex. Civ. Prac. & Rem. Code § 82.005) and that the Texas statute (unlike the MPLA) does not contain a "consumer expectation test" other than for firearms and ammunition (Tex. Civ. Prac. & Rem. Code § 82.006, which precludes design defect liability unless the design defect caused the firearm or ammunition "not to function in a manner reasonably expected").  *Id*. at 260-62.  *Tokai* goes on to note "Courts in jurisdictions that employ a consumer-expectation test for determining defect have mostly held that disposable lighters without childproof features are not defectively designed *because*

21

In *Gray v. Manitowoc Co., Inc.*, 771 F.2d 866 (5th Cir. 1985), a products liability case governed by Mississippi law, we applied the "consumer expectations" or "consumer contemplation" test, *id*. at 869, to hold as a matter of law that the plaintiff, Gray, a construction employee injured when struck by the horizontally moving boom of the "4100W" crane his employer was using on the job, could not recover under strict products liability (or negligence) from the manufacturer of the crane. The crane was in the "boom down" position which obscured the crane operator's field of vision to the left of the boom, where Gray was standing when struck. Gray claimed the crane lacked adequate warnings and was defectively designed because it lacked "mirrors, closed circuit television cameras or other devices to enable the operator to see to the left side of the crane when . . . operated in the 'boom down' position." *Id*. at 867. We held that, as a matter of law, there could be no recovery, notwithstanding the testimony of Gray and an inexperienced co-worker that they were unaware of the blind spot, because the evidence:

> ". . . demonstrated a common awareness in the construction industry of both the limitation on the operator's field of vision inherent in the design of such cranes and the dangers posed by this limitation. Plaintiff adduced no evidence that manufacturers of other cranes of the vintage of the 4100W equipped them with

*they function in the manner expected by the intended adult consumers*. But courts in jurisdictions employing a risk-utility analysis have mostly concluded that the determinative considerations are usually matters for the jury." *Id*. at 262.

22

> mirrors, television cameras or other similar devices. Rather, the evidence showed that there was no such industry custom of providing such devices." *Id*. at 870-71.

We also noted that the crane functioned properly for its intended purpose. *Id*. at 862, 871 n.9.

We find *Gray* highly instructive here.[15]

Here, the evidence is that at the relevant time – May 1982, when the mast left Will-Burt's control – no telescoping masts (or their "payloads"), whether in the broadcast industry or any other, were insulated so as not to conduct electricity or were either equipped or used with any sort of PWD, and the danger of electrocution if the mast was raised so that it or its "payload" came into contact with an overhead power line was well recognized. There is no contrary evidence. This not only continued to be the case in the broadcast industry until the tragic 1997 accident in question but apparently still continues to be the case. There is no evidence that anyone in the industry ever – in 1982 or 1997 or

---

[15]We recognize and respect, of course, that in *Prestage* the Mississippi Supreme Court said it would not follow such cases as *Gray* (and other decisions of this Court) insofar as they hold the "consumer expectations" test, rather than the "risk-utility" test, to be controlling for purposes of Mississippi strict products liability law. *Prestage*, 617 So.2d at 254, 256. However, *Prestage* does *not* suggest that *Gray* (or the other there cited decisions of this Court) constitutes an erroneous or improper application of the consumer-expectations test; if anything it suggests the contrary. *Prestage* adopts the risk-utility test *because* it allows recovery in instances that the court considers appropriate but which would be precluded under the consumer-expectations test.

at any other time – did not realize that a telescoping mast such as this, if raised when under a power line, would not extend to the height of the power line so that the "payload" on top of the mast (or even the mast itself) would come into contact with the power line with serious resultant electric shock, or that any device on or used with the mast, or any characteristic of the mast or of any such device, would prevent such a result or give a prior warning signal of it. The evidence is that Austin had been made aware of these dangers, and there is no contrary evidence. There is simply no evidence that *the mast* "failed to function as expected." That a truly tragic accident occurred in using the mast does not mean that the *mast* failed to function as expected. The *mast* did nothing unusual or unexpected. An ordinary revolver functions as expected if, when loaded and off-safety, the trigger is normally pulled and a bullet is expelled, and this is no less so because, quite unintentionally, someone is struck by the bullet. So also with a cigarette lighter normally ignited and applied to flammable material, notwithstanding that a tragic fire results, or an intact hatchet which strikes a hand placed or left on the target wood.

Because there is no evidence that the mast "failed to function as expected," recovery against Will-Burt for design defect is precluded by section 11-1-63(f)(ii).[16]

---

[16]Except as stated in note 9 above, we do not address whether design defect recovery would be available against the manufacturer apart from the requirement that the plaintiff prove

## Conclusion

For the reasons stated, the judgment of the district court is

AFFIRMED.

---

that when the product left manufacturer's control it failed to function as expected.