RAMIREZ, J.
Arthur Earle Teele, Jr., a former City of Miami Commissioner, appeals the trial court’s final order of conviction and sentence, as well as various orders entered by the trial court during Teele’s jury trial. We find that there was insufficient evidence to support the charge of corruption by threat against a public servant, and thus the trial court erred in denying Teele’s motion for judgment of acquittal with respect to this charge. We, therefore, reverse and remand with directions for the trial court to enter a judgment of acquittal on count 2.
I. FACTUAL BACKGROUND
In July of 2004, the Miami-Dade County Police Department assigned a surveillance team to conduct non-contact undercover surveillance of Teele to determine where Teele went each day. Teele was unaware that he was under any kind of surveillance. The surveillance assignment was named Task Five and consisted of six detectives on the team: Jorge Plasencia, Mark Bul-lard, Ben Guerrero, Lily Gonzalez, Steven White and Greg Benjamin.
Several days a week, the surveillance team would meet in the morning and wait for Teele to leave his apartment. The team members each drove unmarked civilian vehicles and wore civilian clothes. The surveillance usually continued until Teele returned home in the evening.
In August of 2004, on a day when the surveillance team was waiting to follow Teele, Detective Plasencia decided to follow Mrs. Teele by himself. Mrs. Teele was not under any investigation. Detective Plasencia did not obtain prior permission from anyone else at the police department to follow Mrs. Teele.
*1197 Mrs. Teele drove from her residence to her work at Miami International Airport and noticed a light colored SUV following her. The vehicle followed her into the airport parking lot. She became upset and did not leave her vehicle until other pedestrians walked by. When Mrs. Teele arrived home that evening she told her husband that she believed that she was being stalked. Teele told her to be careful.
On August 24, 2004, Teele and his wife left their apartment at Yenetia Plaza in separate vehicles at 8:13 a.m. They both headed for their apartment at 1000 North River Drive. They did not use the same route. That morning, the Task Five surveillance team members were set up outside the Venetia Plaza waiting to follow Teele.
Mrs. Teele and Teele arrived at 1000 North River Drive at approximately the same time. They each drove through the apartment gate. The Task Five surveillance team spread out and waited on the streets close by. When Mrs. Teele got inside her apartment, she told her husband that she thought she saw- a white or light colored SUV following her again. Teele told his wife that she was imagining things. -Mrs. Teele became upset and left the apartment.
Teele also left in his vehicle, a black Hyundai, but exited through the northeast gate and headed north toward Northwest 11th Street. Teele passed by Detective Plasencia on 10th Court. Detective Pla-sencia radioed other Task Five team members that Teele was leaving in his Hyundai and was headed to Northwest 11th Street. All of the detectives started moving toward Northwest 11th Street. Detective Bullard was driving a white SUV and pulled up directly behind Mrs. Teele.
Teele drove a few blocks when he decided to try and catch up to his wife and apologize to her because he realized that he had not handled his wife’s concerns properly. Teele saw the white SUV with dark window tints right behind his wife. The SUV stopped at the stop sign. Teele made a partial u-turn and stopped his vehicle in front of the SUV to block it from moving. Teele got out of the vehicle and asked the unidentified driver for his driver’s license and said that he was going to call the police. The unidentified man turned the wheels of the SUV sharply, stepped on the gas, hopped the curb, and sped away down the sidewalk on 11th Street at 8:32 a.m.
Teele got back into his car and caught up to the SUV which was traveling at approximately 35 mph eastbound on Northwest 11th Street and tried to pull the vehicle over. The SUV did not stop.
At 8:36 a.m., Teele called 9-1-1 and was placed on hold. The call was transferred by Miami-Dade County 9-1-1 to the City of Miami Police Department. At 8:41 a.m., the unidentified SUV pulled over onto the shoulder of the road on interstate 195. Teele pulled his vehicle at an angle in front of the SUV and stopped. Teele got out of his vehicle and left the driver’s side door opened. At that time, the City of Miami 9-1-1 operator came onto Teele’s cellular telephone, which was still in his car. The 9-1-1 operator recorded the entire conversation. The running time of the 9-1-1 tape is 8 minutes 9 seconds.
Teele started walking behind his vehicle to get to the driver’s side of the SUV. The driver was still sitting in the SUV. Detective Plasencia parked behind Teele’s vehicle. He blocked Teele when Teele got to the back of his Hyundai. Detective Guerrero then joined Teele and Detective Plasencia. Detective Benjamin walked to Detective Bullard’s SUV and escorted him out of the vehicle. At all times Detectives *1198 Benjamin and Plasencia were between Teele and Detective Bullard. Detective Benjamin and Detective Bullard walked away from the vehicles and sat on the guardrail a short distance away. Detective Gonzalez stood back initially as Teele spoke with Detective Plasencia and Detective Guerrero. Detective White stayed back and observed the situation but did not participate in any discussion.
The parties stipulated to the transcript of the City of Miami Police Department 9-1-1 tape, as well as the transcript of the August 24, 2004 Task Five Radio Tape. The transcript of the discussion that took place while the 9-1-1 operator was on the line is reflected in the Appendix attached to this opinion. Teele raises three issues on appeal. We only address Teele’s first assignment of error.
In essence, Teele alleges that no one ever told him there was a police investigation of him being conducted and that his numerous requests to see the unidentified man’s (Detective Bullard’s) badge were ignored. After the discussion and the incident ended, Teele drove away.
On September 15, 2004, the State filed a two-count information against Teele. Count one alleged that on August 24, 2004, Teele attempted to ram his vehicle into Detective Bullard’s vehicle, of which constituted an aggravated assault with a deadly weapon (an automobile) in violation of Florida Statutes sections 784.021(1)(A) and 775.087(1). Count 2 alleged that Teele corruptly threatened Detective Bullard and other police officers with the intent and purpose to improperly prevent the performance of their duty with regard to an official police investigation in violation of Florida Statutes section 838.021(3)(B). Specifically, count 2 stated:
... ARTHUR EARLE TEELE JR on or about AUGUST 24, 2004, in the County and State aforesaid, did unlawfully and feloniously threaten unlawful harm to a public servant, to wit: DETECTIVES of the MIAMI-DADE POLICE DEPARTMENT,' INCLUDING DETECTIVE MARK BULLARD, with the intent or purpose to influence the performance of any act or omission which said defendant believe to be, or the public servant represented as being, within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty, to wit: CONDUCTING AN OFFICIAL POLICE INVESTIGATION, in violation of s. 838.021(3)(b) Florida Statutes,, contrary to the form of the Statute in such cases made and provided, and against the peace and dignity of the State of Florida.
The information filed by the State Attorney defined the public servant as police officer Bullard and other officers of-the Miami-Dade County police department. The public duty was defined as “conducting. an official police investigation.” Teele entered a plea of not guilty to both charges.
At 'Teele’s jury trial, after the State rested its case, Teele moved for judgment of acquittal on both counts. With regard to count 2, Teele argued that the State did not present any evidence sufficient to warrant a conviction under count 2. The trial court denied the motion.
After the defense presented its case, the jury found Teele not guilty on count 1 but guilty on count 2. Teele renewed his motion for judgment of acquittal on Count 2 and moved for new trial. The trial court denied both motions.[1]
*1199 II. ANALYSIS
We agree with Teele that the State’s evidence was insufficient to support a conviction for corruption by threat against a public servant, under section 838.021(3)(b), Florida Statutes (2004). Under the facts of this case, the State presented no evidence that Teele intended to corruptly affect a certain ongoing police investigation.
In Johnston v. State, 863 So.2d 271, 283 (Fla.2003), the Florida Supreme Court recognized that in reviewing a motion for judgment of acquittal, a de novo standard of review applies. Pagan v. State, 830 So.2d 792, 803 (Fla.2002). Generally, an appellate court will not reverse a conviction that is supported by competent, substantial evidence. Id,.; Terry v. State, 668 So.2d 954, 964 (Fla.1996). There is sufficient evidence to sustain a conviction only if, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt. Banks v. State, 732 So.2d 1065 (Fla.1999); Beard v. State, 842 So.2d 174, 176 (Fla. 2d DCA 2003). Moreover, if the State’s evidence is wholly circumstantial, there must be sufficient evidence establishing each element of the offense, and the evidence must exclude the defendant’s reasonable hypothesis of innocence. Orme v. State, 617 So.2d 258, 262 (Fla.1996)(“A motion for judgment of acquittal should be granted in a circumstantial evidence case if the state fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.”); Pollen v. State, 834 So.2d 380 (Fla. 3d DCA 2003).
The elements of the crime of corruption by threat against a public servant are set out in section 838.021, Florida Statutes (2004). That section provides, in pertinent part:
(1) Whoever unlawfully harms or threatens unlawful harm to any public servant, to his or her immediate family, or to any other person with whose welfare. the public servant is interested, with the intent or purpose:
(a) To influence the performance of any act or omission which the person believes to be, or the public servant represents as being, within the official discretion of the public servant, in violation-of a public duty, or in performance of a public duty.
(b) To cause or induce the public servant to use or exert, or procure the use or exertion of, any influence upon or with any other public servant regarding any act' or omission which the person believes to be, or the public servant represents as being, within the official discretion of the public servant, in violation of a public duty, or in performance of a public duty.
[[Image here]]
(3)(b) ... shall be guilty of a felony of the third degree, punishable as provided in s. 775.082, s. 775.083, or s. 775.084.
The State claimed that Teele made threats against the police officers, with the intent to influence an official police investigation. We have reviewed the record thoroughly and find that the evidence does not support this allegation.
The 9-1-1 tape transcript clearly shows that Téele repeatedly asked' to see Detective Bullard’s badge, indicating that he was not certain that Detective Bullard was a police officer. The tape reflects that no *1200 one ever said at any time that Detective Bullard already had shown Teele his badge and no one asked Detective Bullard to show Teele his identification and provide his name to resolve Teele’s concerns.
Detective Guerrero also ignored Teele’s requests to see Detective Bullard’s badge. Instead, Detective Guerrero showed Teele his badge and told Teele “... you have a conflict here with this gentleman ... and we’re working ... and that this can be straightened out in a situation in a manner later, on....” None of the officers at the scene were in uniform or drove marked police cars. All .of the detectives were in normal street clothes and drove rental vehicles with no official markings.
At that point, because Teele simply did not know who,the person was in the SUV that had been following his wife, he stated: “Let .... let me tell you something ... I ... Iam armed ... the next time anybody follows my wife ... they better be prepared to start shooting.” Detective Guerrero then said: “Listen to me, don’t make threats like that ...” Teele then responded by clarifying his statement that he was not threatening the officers: “I’m hot making a threat ... I’m simply saying, the next time this officer or whomever follow's my wife ... and he doesn’t show me his badge ... I don’t know if he’s a cop or not.”
Detective Guerrero responded but, again, was not clear about who Detective Bullard was. “I’m asking you ... look ... I wouldn’t be here ... unless ... he ... you know ... unless he worked with us, OK? ...” Teele then reiterates that he is not trying to stop any legitimate police work that may relate to him and states: “Do what you want to with me ...” Finally, Detective Guerrero states for the first time that Detective Bullard is a police officer conducting an investigation: “All you know is that there’s a police officer here conducting an investigation ... that’s all you need to know, sir ...” The statement made, by Teele that he was armed was further clarified and retracted when Detective Gonzalez told Teele: “If there’s a weapon in the car you better not get in that car.” Teele testified that he told Detective Gonzalez: “Lady there’s no weapon.” [2] Later, Detective Gonzalez again states: “I’m asking you, do you have - a weapon in the car?” Teele replied: “If you want to conduct a search officer, you can.”
The 9-1-1 tape indicates that no one ever told Teele that his wife was being followed. Detective Plasencia actually denied this. No one ever told Teele that his wife might be followed in the future as part of their investigation. The detectives testified that Mrs. Teele was not under their surveillance. During closing arguments, the State conceded that the police were not surveilling or investigating Mrs. Teele. Teele testified at trial that he was only worried about his wife’s safety and was not trying to stop the detectives from doing their jobs. In sum, there simply are no facts that support the allegation that Teele was unlawfully threatening Detective Bullard with the intent to unlawfully affect his ongoing official police investigation of Teele.
The facts of this case are similar to the facts in Bragg v. State, 475 So.2d 1255 (Fla. 5th DCA 1985). In Bragg, a sheriffs deputy arrived at Bragg’s neighbor’s house after Bragg was observed screaming and firing a gun in the air. The deputy asked to speak to Bragg, but Bragg refused. The deputy went to speak to Bragg’s wife to determine if she was in danger. After the deputy came onto Bragg’s property, *1201 Bragg told him to go away or he would kill him. The jury convicted Bragg.
The Fifth District Court of Appeal reversed Bragg’s conviction under section 838.021, Florida Statutes (2004), because the elements of the crime required proof that the threat of harm was used to influence the person threatened to do, or not do, some official act. Id. at 1257. The Fifth District found that there was no evidence that Bragg’s threats were made to corruptly influence the deputy. The court noted that the deputy went on Bragg’s property without a warrant and with no announced lawful purpose. Id. The court stated that it was mindful of the potentially dangerous, even lethal, situation which existed but held that it was not unlawful for Bragg to demand that the deputies depart. Id.
Here, Teele did not make a threat to influence any detective to do, or not to do, some official act. Teele saw someone following his wife, knew that she was worried about being followed in the past, and did not know that the person following his wife was a detective. He did not know that there was a surveillance team and he did not know that there was an official investigation of him being conducted. Teele had just as much right to protect the safety of his wife as Mr. Bragg had to ask uninvited persons to leave his property. Teele had a legal right to protect his family, as well as constitutional rights of free speech, assembly and protest. Teele’s acts were protected by the United States Constitution as well as the Constitution of the State of Florida.
Furthermore, Teele had a lawful right to follow the person who he saw following his wife, and to call 9-1-1 and the police. When Detective Bullard first pulled his vehicle over on to the shoulder of interstate 195 and stopped, Teele did not know that Detective Bullard was a police officer. Any alleged threat that the State may claim to have occurred at that time would clearly not constitute a violation of section 838.021.
It is evident from the record that Teele never saw Detective Bullard’s badge and was never provided his name. Teele asked to see the identification repeatedly, a completely lawful request given that Teele saw Detective Bullard in street clothes and an unmarked car, following his wife.
At the time of this discussion the officers had no warrant, had not announced a lawful purpose for following Mrs. Teele but instead denied that they had followed her or that they intended to arrest Teele. On several occasions, the detectives testified that Mrs. Teele was not the target of any investigation.
There is no evidence to support the State’s contention that Teele intended his alleged threat to corruptly affect any aspect of the official police investigation of Teele. The only statements that Teele made or was alleged to have made related to the issue of someone following his wife. However, the testimony of the police officers confirmed that Teele was told that no one was following his wife. The 9-1-1 tape recording proves that Teele was told from the beginning: “He wasn’t following your wife Mr. Teele.”
III. CONCLUSION
In sum, the State failed to establish here that Teele was aware of an ongoing police investigation. Thus, Teele’s conduct was legally insufficient to support a conviction for corruption by threat against a public servant, under section 838.021(3)(b), Florida Statutes (2004). Accordingly, we reverse this conviction and its sentence. We therefore remand the case to the trial court with instructions that the trial court *1202 enter a judgment of acquittal on that count.
Reversed and remanded.

APPENDIX

The City of Miami Police Department 9-1-1 tape reflects the following conversation:
TEELE: That’s bullshit ... no sir ... I’m not listening to shit ... I have a right to see his badge
PLASENCIA: I’m telling you ...
TEELE: I have ...
PLASENCIA: ... to calm down
TEELE: I’m not calming down until I see his goddamn badge
(unintelligible)
TEELE: I have a right to see a badge
PLASENCIA: Can I speak to you for a second?
TEELE: No sir, I have a right ...
PLASENCIA: I am telling you ...
9-1-1 DISPATCHER: Hello ... hello ... Miami Police
PLASENCIA: (unintelligible) ... that he works for me ... OK?
TEELE: I don’t care who he works for ... I have a right to see his badge. He’s following my wife and I want ...
PLASENCIA: He wasn’t following your wife ... Mr. Teele ...
9-1-1 DISPATCHER: Hello ... someone want to tell the police what’s going on? Is someone there want to tell me what’s going on?
TEELE: I have a right to see this man’s badge. You’re not going to make the rules up as you go along. You are not going to make the rules up as you go
GUERRERO: Sir, sir ... you’re a Commissioner ... you’re risking ... (unintelligible)
TEELE: I have a problem with you following my wife
GUERRERO: (unintelligible) ... keep in mind that your ... (unintelligible)
TEELE: But ... uh ... uh ... uh ... I still have a thing ... (unintelligible) ... about my rights as a citizen
GUERRERO: I understand that too ... I understand that ... OK ... listen to me ... you’re gonna risk ... you’re gonna risk ... an embarrassing situation for yourself ... OK
9-1-1 DISPATCHER: Hello ... hello TEELE: ... I have a right to ...
GUERRERO: I’m go-... I’m going to try to ... I understand that, Mr. Teele ...
TEELE: ... to see your badge ...
9-1-1 DISPATCHER: Hello ... hello
GUERRERO: Here it is, here it is ... listen to me
9-1-1 DISPATCHER: ... this is the Miami Police
TEELE: ... this is wrong ... this is absolutely wrong
TEELE: ... you’re ... you’re not making the rules up as you go
(unintelligible)
TEELE: ... an officer ...
GUERRERO: Calm down don’t get
9-1-1 DISPATCHER: Hello ... can’t hear you ... are they still out on the scene
GUERRERO: Don’t get yourself involved in a situation that you’re gonna regret later on
9-1-1 DISPATCHER: Hello ... this is the police
*1203 TEELE: For asking a police officer for his badge?
GUERRERO: I’m giving you my badge
9-1-1 DISPATCHER: This is the police
TEELE: That’s the police officer ... that
9-1-1 DISPATCHER: I’m on the line
GUERRERO: Listen to me ... don’t you understand ... at this point ... that you’re ... you ... you have ... you have ... a conflict here with this gentleman ... and we’re working ... and that this can be straightened out in a situation in a manner later on ... that may be beneficial to everybody and not just a problem here that you may cause for yourself ... please try to keep that in mind, OK?
TEELE: Officer, all I’m asking ...
GUERRERO: You’re angry ... you’re angry ... and we’re asking you to please
TEELE: Let ... let me tell you something ... I ... I am armed ... the next time any body follows my wife ... they better be prepared to start shooting ...
GUERRERO: Mr. Teele ... Mr. Teele
TEELE: Do what you want to with me
GUERRERO: Mr. Teele, Mr. Teele ...
TEELE: I’m just telling you ...
GUERRERO: Listen to me, don’t make threats like that ...
TEELE: I’m not making a threat ... I’m simply saying, the next time this officer or whomever follows my wife ... and he doesn’t show me his badge ... I don’t know if he’s a cop or not ...
GUERRERO: Mr. Teele ...
GUERRERO: Mr. Teele ... look ... I have a badge ... hanging from my neck
TEELE: But ... but he doesn’t ...
GUERRERO: I’m asking you ... look ... I wouldn’t be here ... unless ... he ... you know ... unless he worked with us, OK? I’m asking you ... you’re angry right now ...
TEELE: I’m ... I’m ...
GUERRERO: Please ...
TEELE: Do what you want to with me
GUERRERO: I don’t want to do that to you ...
GUERRERO: Remember ... (unintelligible) ... anybody any harm, OK ... I’m trying to give you that. Please keep that in mind, OK? Please ... you’re a public servant ... you don’t want us to ...
TEELE: ... you think it doesn’t give me the right ...
GUERRERO: We’re not going ...
TEELE: I don’t lose my rights ...
GUERRERO: Sir ...
GUERRERO: We’re not asking you to lose your rights ...
TEELE: Yes, you are ...
GUERRERO: We’re not taking your right away from you, sir ...
TEELE: Yes you are ...
GUERRERO: We aren’t
TEELE: I have a right to ask the officer for his i.d.
GUERRERO: All you know is that there’s a police officer here conducting an investigation ... that’s all you need to know, sir ... and we’re giving you that ... we’re giving you that courtesy ...
TEELE: ... that ... that ...
*1204 GUERRERO: We’re giving you that courtesy
9-1-1 DISPATCHER: Hello ... this is the Miami police again ... is anybody there?
SOUND OF CAR DOOR
SOUND OF CAR DOOR CHIMES
GONZALEZ: If there’s a weapon in the car you better not get in that car
TEELE: Lady there’s no ... (unintelligible)
(unintelligible)
TEELE: Now tell her don’t start threatening me
GUERRERO: We’re not going to threaten anybody
GONZALEZ: Nobody’s threatening you
GONZALEZ: I’m asking you if you have a weapon ... in the car ... you said you were armed ...
TEELE: Are you stopping me?
GONZALEZ: Yes I am ... and I’m asking you ... if you have a weapon ...
TEELE: Lady, don’t you raise your voice at me ...
GONZALEZ: Don’t you raise your voice at me ...
TEELE: Don’t point your finger at me
GONZALEZ: Don’t do it either ...
TEELE: I didn’t point my finger at ...
GONZALEZ: I’m asking you, do you have a weapon in the car?
SOUND OF CAR DOOR
TEELE: If you want to conduct a search, officer, you can ...
GONZALEZ: I’m not conducting a search ... I’m asking you if you have a weapon in the car ...
TEELE: Officer, if you ...
TEELE: Officer ...
GONZALEZ: You got out of the car ... and you said ... that you would start shooting
TEELE: Officer ...
GONZALEZ: Did you not say that Mr. Teele?
TEELE: I did not say ...
GONZALEZ: Did you not throw your car at the officer?
TEELE: I did not throw my ... GUERRERO: Mr. Teele ...
GONZALEZ: Yes ... you were throwing your vehicle in front of the officer ... were you not doing that?
GONZALEZ: Were you not doing that? GUERRERO: Mr. Teele ...
GONZALEZ: Because everybody in this squad saw that ...
TEELE: Officer, what’s your name?
GONZALEZ: You tried to ram into the vehicle ...
TEELE: What’s your name, officer? GUERRERO: Sir ...
TEELE: What?
GUERRERO: Sir ...
GONZALEZ: Were you not ramming your ... (unintelligible)
TEELE: Officer, what is your name?
GONZALEZ: Do you have a weapon in the car?
TEELE: ... officer ...
GONZALEZ: Do you have a weapon in the car?
*1205 GONZALEZ: I’m asking you, do you have a weapon with you?
TEELE: I’m asking you for your name
GONZALEZ: For officer safety, I’m asking you ...
TEELE: what’s your name?
GONZALEZ: I’m asking you if you have a weapon in your vehicle ...
TEELE: ... officer ...
GUERRERO: Mr. Teele ...
GONZALEZ: I’m asking you ...
TEELE: How many people am I gonna have to talk to at once?
GUERRERO: Please ... step out of the car, for me, will you please ... please ... for me
SOUND OF CAR DOOR CHIMES ENDS (unintelligible)
GUERRERO: ... let me write all this stuff down ... come over here Mr. Teele
TEELE: ... I mean, the woman starts
GUERRERO: Sir ... sir ...
TEELE: You know ... she’s got an attitude ...
GUERRERO: OK
TEELE: She’s got to prove she’s one of the men by start ... I mean ... I didn’t say one word to her ... I didn’t know she was here ... she comes over and points her finger at me and starts yelling to me
GUERRERO: Hey ...
PLASENCIA: That’s bullshit
TEELE: That’s no way to run an operation ... I mean, you know ... she can be Secret Service or DEA, it doesn’t matter to me ... you don’t just walk in and start pointing your fingers ...
GUERRERO: Sir ... sir ... sir ... sir
(unintelligible)
TEELE: How did I know that was an officer?
GONZALEZ: You should know better than that
TEELE: How do I know ...
GONZALEZ: It doesn’t matter who it was ... you don’t do that
TEELE: You don’t tell me what to do.
(unintelligible)
TEELE: What’s that officer’s name? I’m gonna call my lawyer ... who’s in charge?
PLASENCIA: I’m gonna give you my card ... OK ... my card ... you can call me ... (unintelligible)
(unintelligible)
SOUND OF MUSICAL RING TONE ON CELLPHONE
TEELE: I’ll have a lawyer to ... to call you ... this is bullshit ... I’m filing ... I’m filing an IA against him
PLASENCIA: OK ...
PLASENCIA: OK ... (unintelligible)
TEELE: ... I just want to know who to file the IA with ...
PLASENCIA: OK ...
PLASENCIA: Just give me a call ... or have your lawyer give me a call, and I’ll give you all the information, OK?
TEELE: Certainly.
(unintelligible)
PLASENCIA: Hello?
SOUND OF NEXTEL CHIRP
GONZALEZ: (unintelligible)
*1206 TEELE: Let’s back up. I said-I said-the next time a person follows my wife I will park and I will come out shooting ...
PLASENCIA: I can assure you ...
TEELE: I didn’t say I had a weapon in the car. Prove it ... (unintelligible) ... and normally when you approach a proper person (unintelligible) you’re the first person to ramble with me ... I’m filing an IA against her and the black gentleman who followed my wife.
(unintelligible)
PLASENCIA: Yeah.
PLASENCIA: (unintelligible ... still talking on phone)
9-1-1 DISPATCHER: I’m gonna have to discontinue this call ... because I’m not getting through ... are you there? Mobile caller, are you there? Hello? (unintelligible) ... hello?
SOUND OF DISCONNECT TONE

. Thereafter, Teele was removed as a City of Miami Commissioner. We have denied the State’s renewed motion to dismiss this appeal because Teele is now deceased, as his convic *1199 tion prevents his wife from making a valid claim for death benefits under his City of Miami pension plan.

. The tape transcript reflects: “Lady there’s no (inaudible).”